# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CRAIG SAMUELS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2021-0358-PAF |
| | ) | |
| CCUR HOLDINGS, INC., DAVID J. | ) | |
| NICOL, ROBERT PONS, and | ) | |
| STEVEN G. SINGER, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: February 15, 2022
Date Decided: May 31, 2022

Eric M. Andersen, ANDERSEN SLEATER SIANNI LLC, Wilmington, Delaware; *Attorney for Plaintiff Craig Samuels*.

Catherine A. Gaul, ASHBY & GEDDES, P.A., Wilmington, Delaware; Ryan Phair, Daniel Stefany, HUNTON ANDREWS KURTH LLP, Washington, D.C.; *Attorneys for Defendants CCUR Holdings, Inc., David J. Nicol, Robert Pons, and Steven G. Singer*.

**FIORAVANTI, Vice Chancellor**

In 2020, the board of directors of CCUR Holdings, Inc. ("CCUR" or the Company") approved an amendment to the Company's certificate of incorporation to effect a 3000-for-1 reverse stock split (the "Reverse Split"). The stated purpose of the Reverse Split was to take CCUR private and avoid the expense and administrative burden of operating as a public company. In the Reverse Split, any stockholder owning any number of pre-split shares not evenly divisible by 3000 would have those shares—which would be fractional interests after the split—cashed out at $3.06 per pre-split share.

Shortly after approving the Reverse Split, the Company learned that approximately $13.8 million of its funds held in escrow had been frozen after the arrest of the escrow agent's principal. CCUR's board of directors (the "Board") then wrote down the full amount of the frozen funds as a loss, reassessed the Reverse Split, and decided to lower the amount paid for fractional interests to $2.86 per pre-split share. The Reverse Split became effective on April 22, 2021.

Plaintiff held 500 shares of CCUR stock immediately prior to the consummation of the Reverse Split, after having sold more than 65,000 shares between the announcement of the Reverse Split and its effective date. Plaintiff alleges the directors breached their fiduciary duties in approving and effecting the Reverse Split. He also alleges the Company violated Section 155 of the Delaware

General Corporation Law because the amount paid for his fractional interests did not reflect fair value as the statute requires.

Defendants have moved to dismiss the complaint for lack of standing and for failure to state a claim upon which relief may be granted. Defendants also seek to strike certain allegations in the Complaint. In this opinion, the court grants the motion to dismiss the breach of fiduciary duty claim for failure to state a claim. The claim alleging a statutory violation survives. The court also denies the motion to strike.

## I. BACKGROUND

The facts recited in this Memorandum Opinion are drawn from the Verified Amended Class Action Complaint (the "Complaint") and documents integral thereto or otherwise subject to judicial notice.

### A. The Parties

Defendant CCUR is a Delaware corporation that owns subsidiaries engaged in a variety of businesses.[1] Prior to the Reverse Split the Company was traded on the OTCQB market maintained by the OTC Markets Group, Inc.[2] Following the Reverse Split, CCUR serves as a holding company with various subsidiaries and has two operating segments: merchant cash advance operations and other financial

---

[1] Dkt. 1 ("Compl.") ¶ 8.

[2] *Id.*

2

services, and real estate.[3]  Defendants Robert M. Pons, David J. Nicol, and Steven G. Singer are CCUR's three directors (the "Director Defendants," and with CCUR, the "Defendants").[4]

Plaintiff Craig Samuels ("Plaintiff") owned 500 shares of CCUR common stock as of the Reverse Split's effective date (the "Effective Date").[5]  Before the announcement of the Reverse Split, Plaintiff owned 66,298 shares of CCUR common stock.  Between the announcement of the Reverse Split and the date it was effected, he sold 65,798 of those shares in the market.[6]  Because Samuels owned less than 3,000 shares as of the Effective Date, his 500 pre-Reverse Split shares were cashed out on the Effective Date for $2.86 per pre-split share; he is no longer a CCUR stockholder.[7]

## B.    The Reverse Stock Split

On December 21, 2020, CCUR's Board proposed and unanimously voted to amend the Company's certificate of incorporation to effect the Reverse Split.[8]

---

[3] *Id.*

[4] *Id.* ¶¶ 9–12.

[5] *Id.* ¶ 7.

[6] *Id.*

[7] *Id.*

[8] CCUR Holdings, Inc., Preliminary Information Statement (Schedule 14C) (Dec. 23, 2020) at 2, available at https://www.sec.gov/Archives/edgar/data/0000749038/000114036120029409/brhc10018

3

Under the terms of the Reverse Split, stockholders who held fewer than 3,000 shares as of the Effective Date would receive $3.06 per share for their stock. Stockholders who held at least 3,000 shares as of the Effective Date would receive: (1) one share of new common stock in the Company in exchange for every 3,000 existing shares, and (2) $3.06 in cash for each share remaining below the 3,000 share threshold.[9] CCUR's outside financial advisor, ValueScope, Inc. ("ValueScope"), based the $3.06 per share valuation on the Volume Weighted Average Price ("VWAP") of the Company's stock.[10] ValueScope calculated the VWAP over three measurement points—the last six months of trading through December 18, 2020; the last month of trading through December 18, 2020; and the first 18 days of trading in December 2020—and selected the average of those three calculations to reach $3.06 per

325_pre14c.htm [hereinafter Preliminary Information Statement]. The court may consider this filing, which is referenced in Plaintiff's Verified Class Action Complaint. The court may also take judicial notice of such public filings with the SEC. DEL. R. EVID. 201; *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 n.28 (Del. 2004) (holding that a court may take judicial notice of documents required by law to be filed and actually filed publicly with federal agencies, such as the SEC); *see also In re Rural Metro Corp. S'holders Litig.*, 2013 WL 6634009, at *7 (Del. Ch. Dec. 17, 2013) ("Delaware courts have taken judicial notice of publicly available documents that 'are required by law to be filed, and are actually filed, with federal or state officials.'"). The court likewise takes judicial notice under this reasoning for all SEC filings hereinafter cited in this opinion.

[9] Preliminary Information Statement at 3.

[10] *Id.* at 25.

share.[11] ValueScope was paid a fee of $25,000, "of which $15,000 was payable upon entry into [its] engagement letter" with the Company, for its analysis.[12]

On December 23, 2020, the Company announced the Reverse Split in a "Preliminary Information Statement" filed with the United States Securities and Exchange Commission (the "SEC"). The Preliminary Information Statement disclosed that the Board and stockholders holding 52% of the Company's outstanding voting stock, acting by written consent, had approved the Reverse Split. The Company explained that the purpose of the Reverse Split was to facilitate a "'going private' transaction to terminate the Company's registration and periodic reporting obligations under the Exchange Act, and continue future operations as a private company, thereby relieving [CCUR] of the costs, administrative burdens and competitive disadvantages associated with operating as a public company."[13] According to the Preliminary Information Statement, the Company had 8,972,524 shares of common stock issued and outstanding, and as of December 21, 2020, had 3,731 non-objecting beneficial owners. The Company anticipated that after the

---

[11] *Id.*

[12] *Id.* at 24. CCUR also agreed to "reimburse ValueScope for its reasonable out-of-pocket expenses incurred in connection with its engagement and to indemnify it against liabilities relating to or arising out of its engagement." *Id.*

[13] Preliminary Information Statement at 15.

Reverse Split "there will be approximately 2,737 shares of new Common Stock issued and outstanding held by approximately 235 stockholders."[14]

The Preliminary Information Statement explained that the Board did not establish an independent or special committee to act on behalf of unaffiliated stockholders[15] because, among other reasons, both affiliated and unaffiliated stockholders would be identically affected.[16] Additionally, the Preliminary Information Statement disclosed that "all of the Board members are independent, and collectively own, in the aggregate, less than two percent" of the Company's stock.[17] Having concluded that the full Board could be fair in assessing the proposed Reverse Split, the Board determined that the time and expense needed to assemble a special committee was "unwarranted."[18] According to the Preliminary Information Statement, the Board concluded that the Reverse Split was "substantively and procedurally fair to . . . [the Company's] unaffiliated stockholders."[19]

---

[14] *Id.* at 6.

[15] The Preliminary Information Statement defines "Affiliated Stockholders" to include "directors, executive officers and beneficial owners of more than 5% of the Company's outstanding Common Stock." *Id.* at 26.

[16] *Id.* at 22.

[17] *Id.*

[18] *Id.*

[19] *Id.*

6

## C. Subsequent Developments Reduce the Reverse Split's Per Share Cash Consideration.

Since August 2018, CCUR had financed 12 transactions in the aircraft finance market using Wright Brothers Aircraft Title, Inc. ("Wright Brothers") as its escrow agent.[20] On January 12, 2021, the Company was due $8.5 million in fully refundable deposits that it had provided as part of the financing. Around this time, the Company unsuccessfully attempted to contact both Wright Brothers and its principal, Debbie Mercer-Erwin, to inquire as to the status of the $8.5 million that was due. CCUR subsequently learned, however, that Mercer-Erwin had been arrested on or around December 17, 2020 and that all of Wright Brothers' assets had been frozen. The Company was due an additional $5.5 million in fully refundable deposits in connection with this same financing on January 25, 2021.[21] On February 6, 2021, the Board approved a $13.8 million full write-down of the fully refundable deposits that it was owed by Wright Brothers.[22] While CCUR was named as an "Additional Insured under certain insurance policies maintained by Wright Brothers,"[23] the Company ultimately determined that it was "probable a loss ha[d] occurred . . . [d]ue

---

[20] CCUR Holdings, Inc., Current Report (Form 8-K) (Jan. 26, 2021), available at https://www.sec.gov/Archives/edgar/data/0000749038/000110465921007747/tm214263d 1_8k.htm [hereinafter Jan. 2021 8-K]; *see also* Compl. ¶ 19.

[21] Jan. 2021 8-K; *see also* Compl ¶ 19.

[22] Compl. ¶¶ 19, 21.

[23] Jan. 2021 8-K.

to the limited information available and uncertainty related to the specific sources of recovery and their timing."[24]

On February 15, 2021, the Board received an updated valuation analysis from ValueScope that reduced the Company's valuation to $2.86 per share.[25] On February 22, the Board unanimously determined "that in light of the changed circumstances, it would be appropriate" to reduce the per share cash consideration for the Reverse Split to $2.86 per share, reflecting ValueScope's updated valuation.[26] ValueScope arrived at its new valuation by calculating the Company's volume weighted average price ("VWAP") between January 27, 2021, the date the Wright Brothers losses had first been publicly disclosed, and February 12, 2021.[27] The revised valuation and analysis were disclosed in a second Preliminary Information Statement that was filed on February 24, 2021,[28] which was followed by the Definitive Information Statement on March 26, 2021 (the "Information

---

[24] CCUR Holdings, Inc., Preliminary Information Statement (Schedule 14C) (Feb. 24, 2021) at 19, available at https://www.sec.gov/Archives/edgar/data/0000749038/000110465921027469/tm217742d 1_prer14c.htm [hereinafter Feb. 2021 Information Statement].

[25] Feb. 2021 Information Statement at 19.

[26] *Id.*; *see also* Compl. ¶ 19.

[27] Feb. 2021 Information Statement at 28.

[28] *See* Feb. 2021 Information Statement.

8

Statement").[29]  According to the Information Statement, the Reverse Split at the

$2.86 cash-out price had been effected through an amendment to the Company's

certificate of incorporation.[30]  The Information Statement states that "stockholders

holding 52.0% of the voting power of all of our stockholders entitled to vote" had

approved the certificate amendment by written consent.[31]  The Reverse Split became

effective on April 22, 2021.[32]  That same day, the Company terminated its securities

registration.[33]

---

[29] *See* CCUR Holdings, Inc., Definitive Information Statement (Schedule 14C) (Mar. 26, 2021),                                available                                at https://www.sec.gov/Archives/edgar/data/0000749038/000114036121010184/nt1002232 0x1_def14c.htm#tANNA [hereinafter Mar. 2021 Information Statement].

[30] *Id.* at 1.

[31] *Id.*  The version of the Company's certificate of incorporation submitted by Defendants states:  "No action required or permitted to be taken at any annual or special meeting of stockholders of the Corporation may be taken without a meeting except upon the written consent of holders of 100% of the shares of capital stock of the Corporation entitled to vote upon such action."  Defs.' Op. Br., Ex. C, art. Ninth.  Plaintiff has not asserted any claim challenging the validity of the stockholder vote to effect the Reverse Split.

[32] *See* CCUR Holdings, Inc., Current Report (Form 8-K) (Apr. 16, 2021), available at https://www.sec.gov/Archives/edgar/data/0000749038/000114036121013814/brhc10023 331_8k.htm.

[33] CCUR Holdings, Inc., Certification and Notice of Termination of Registration (Form 15)           (Apr.           22,           2021),           available           at https://www.sec.gov/Archives/edgar/data/0000749038/000114036121013815/brhc10023 330_1512g.htm.

9

## D. Procedural History

On April 26, 2021, Plaintiff filed a two-count Verified Class Action Complaint (the "Complaint").[34] Count I alleges that all of the Director Defendants breached their fiduciary duties through their approval of the Reverse Split. Plaintiff alleges that the Reverse Split was a product of self-dealing, resulting in an unfair price for those stockholders who were cashed out of their fractional interests. Count II is a claim against the Company for violating 8 *Del. C.* § 155. Section 155(2) requires a Delaware corporation to pay "fair value" to stockholders who are cashed out for their fractional interests in a reverse stock split. Plaintiff alleges that the Company's payment of $2.86 for each pre-split share not evenly divisible by 3,000 violated the statute because it was less than fair value.

Defendants have moved to dismiss the Complaint for failure to state a claim and lack of standing. Specifically, Defendants argue that the Board's approval of the Reverse Split and its terms must be afforded deference under the business judgment rule, and the Complaint fails to allege a non-exculpated claim of disloyalty or bad faith.[35] Defendants further contend that Plaintiff's standalone claim under Section 155 is non-cognizable, and even if it were recognized, the $2.86 price per pre-split share constituted fair value for stockholders' fractional interests under the

---

[34] *See* Dkt. 1.

[35] Dkt. 19 ("Defs.' Op. Br.") at 10–21.

10

statute.[36]  Additionally, Defendants challenge Plaintiff's standing to bring his claims altogether, or alternatively, his ability to represent the class of stockholders he purports to represent.[37]  Defendants have also moved to strike certain paragraphs of the Complaint if their motion to dismiss is not granted in its entirety.[38]  On February 15, 2022, the court heard argument on Defendants' motion.[39]

## II.    ANALYSIS

On a motion to dismiss for failure to state a claim under Court of Chancery Rule 12(b)(6):

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and ([iv]) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.

*Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (internal citations and quotations omitted).  Although the pleading standards are minimal, *Central Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011), "a trial court is required to accept only those 'reasonable inferences that logically flow from the face of the complaint' and 'is not required to accept every strained

---

[36] *Id.* at 21–29.

[37] *Id.* at 30–34.

[38] *Id.* at 34–38.

[39] *See* Dkt. 25 ("Hrg.").

interpretation of the allegations proposed by the plaintiff,'" *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (quoting *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001)). The court need not "simply accept conclusory allegations unsupported by specific facts, nor . . . draw unreasonable inferences in the plaintiff's favor." *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009). "Moreover, a claim may be dismissed if allegations in the complaint or in the exhibits incorporated into the complaint effectively negate the claim as a matter of law." *Malpiede*, 780 A.2d at 1083.

## A. Standing

Defendants argue that Plaintiff's participation in the Reverse Split bars him from challenging it under principles of standing, relying on *Bershad v. Curtiss-Wright Corp.*, 535 A.2d 840 (Del. 1987). In *Bershad*, the plaintiff sued for breach of fiduciary duty in connection with a cash-for-stock merger. At the time the merger was proposed, the acquirer was already a majority stockholder in the acquiree and conditioned the merger on a majority-of-the-minority stockholder vote. While the plaintiff initially, and unsuccessfully, voted against the merger, he ultimately tendered all of his shares to the acquirer in exchange for the merger consideration. The Court of Chancery granted the defendants' motion for summary judgment and the plaintiff subsequently appealed. The Delaware Supreme Court affirmed, holding that "when an informed minority shareholder either votes in favor of the merger, or

12

like Bershad, accepts the benefits of the transaction, he or she cannot thereafter attack its fairness. . . . Since Bershad tendered his shares and accepted the merger consideration, he acquiesced in the transaction and cannot now attack it." *Id.* at 848. Defendants here maintain that Plaintiff would have remained a stockholder had he not sold enough shares to fall below the 3,000-share threshold before the Effective Date. Therefore, Defendants contend Plaintiff voluntarily availed himself to the benefits of the Reverse Split just like the plaintiff in *Bershad*.[40]

Defendants' argument suffers from a basic logical flaw. Plaintiff was involuntarily cashed out of his 500 shares. Defendants also ignore that even if Plaintiff had done nothing—and remained a post-split stockholder—he still would have had a portion of his pre-split shares cashed out because his holdings were not evenly divisible by 3,000. Plaintiff did not vote in favor of the certificate amendment that effected the Reverse Split—it was effected by a written stockholder consent and Plaintiff was not among the consenting stockholders.

The Defendants' argument is similar to one that Vice Chancellor Laster rejected in *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442 (Del. Ch. 2011). There, the plaintiff, suing on behalf of the beneficiaries of an estate, challenged a reverse split conducted under Section 155. In what the court characterized as a "Hail Mary"

---

[40] Defs.' Op. Br. 30–31.

argument, the defendants argued that the plaintiff was estopped from disputing the reverse split because she was initially supportive of the prospect of receiving cash for the estate's beneficiaries when the company had offered to buy the shares directly. When it became clear that the plaintiff was holding out for a higher price, the company eventually resorted to a reverse split. The plaintiff did not vote for the reverse split, nor did she tender any shares in response to it. In rejecting the defendants' estoppel argument, the court reasoned that the plaintiff never endorsed the price of the reverse split. Instead, she merely indicated support for a mechanism by which the beneficiaries could receive cash. *Id.* at 479. The court thus determined that the plaintiff's actions were insufficient for the defendants' affirmative estoppel defense. *Id.* Here, Plaintiff is no differently situated than the plaintiff in *Reis*. And like the defendants in *Reis*, Defendants here have not shown that Plaintiff endorsed the Reverse Split at the chosen price.

Defendants argue that the range of prices for which Plaintiff sold his shares included prices below that being offered under the Reverse Split. But Plaintiff also sold shares at prices above $2.86 per share.[41] Defendants cite no authority for the proposition that selling some shares in the open market for a price that is less than or equal to a merger or tender offer price, or the cash-out price in a reverse stock

---

[41] Compl. ¶ 7.

split precludes a challenge to the transaction as to shares held on the transaction date. Plaintiff accordingly has standing to bring his claims.[42]

## B. The Breach of Fiduciary Duty Claim

Plaintiff asserts that the Director Defendants breached their fiduciary duties by approving the Reverse Split at an unfair price. According to the Complaint, the court should assess the fiduciary duty claim under the stringent entire fairness standard because all of the Director Defendants had conflicts of interest at the time that they voted in favor of the Reverse Split.[43] Defendants counter that the Reverse Split was not a conflicted transaction, and the court should apply the deferential business judgment rule in analyzing Plaintiff's claim. Furthermore, Defendants contend that an exculpatory provision in the Company's certificate of incorporation

---

[42] During briefing and argument, Defendants alternatively contended that Plaintiff is unfit to be a class representative because his claims lack the typicality and commonality required under Court of Chancery Rule 23. Plaintiff, however, has not yet moved for class certification. Furthermore, Defendants' have only moved to dismiss the Complaint under Court of Chancery Rule 12(b)(6) and to strike particular paragraphs of the Complaint under Court of Chancery Rule 12(f). Dkt. 16. Consequently, Plaintiff has represented that he will address Defendants' Rule 23 arguments once he moves for class certification. Pl.'s Ans. Br. 27. It is premature to rule on the adequacy of Plaintiff as a class representative. *Cf. Manzo v. Rite Aid Corp.*, 2002 WL 31926606, at *4 (Del. Ch. Dec. 19, 2002) (recognizing that "the Court need not reach all the issues relevant to class certification on this motion to dismiss," but holding that the plaintiff was an inadequate class representative because she failed to adequately allege facts demonstrating her own standing), *aff'd*, 825 A.2d 239 (Del. 2003).

[43] Compl. ¶¶ 28–30.

15

limits the Director Defendants' liability to conduct that rises to the level of bad faith or breaches the duty of loyalty.

### 1. The Appropriate Standard of Review

"Delaware's default standard of review is the business judgment rule." *Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *25 (Del. Ch. Apr. 14, 2017). This deferential standard merely requires the court to examine "whether the business decision made was rational in the sense of being one logical approach to advancing the corporation's objectives." *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 598 (Del. Ch. 2010). The business judgment rule is a rebuttable presumption; a challenger thus bears the burden of showing why the business decision at issue should not be afforded judicial deference. *Huff Energy Fund, L.P. v. Gershen*, 2016 WL 5462958, at *11 (Del. Ch. Sept. 29, 2016).

On the other end is Delaware's most exacting standard—entire fairness review. The court will substitute this standard for the business judgment standard when a company's board of directors operates while harboring actual conflicts of interest, *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 44 (Del. Ch. 2013), or if a plaintiff demonstrates that a transaction involves a conflicted controller, *Tornetta v. Musk*, 250 A.3d 793, 798, 800 (Del. Ch. 2019). If the court determines that entire fairness review is warranted, the defendants must establish that the transaction was

the product of fair dealing and fair price. *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1163 (Del. 1995).

At oral argument, Plaintiff abandoned some of the allegations in his Complaint. He confirmed that he does not allege the existence of a controlling stockholder[44] or that the directors are self-interested in the Reverse Split.[45] Instead, Plaintiff solely challenges the Director Defendants' independence.[46]

The court starts with the presumption that all directors are independent. *Frederick Hsu*, 2017 WL 1437308, at *26. "Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." *Aronson v. Lewis*, 473 A.2d 805, 816 (Del. 1984). A director lacks independence when the director "act[s] to advance the self-interest of an interested party from whom they could not be presumed to act independently." *In re Cornerstone Therapeutics Inc, S'holder Litig.*, 115 A.3d 1173, 1179–80 (Del. 2015). Thus, to overcome the presumption of independence, a plaintiff must plead facts demonstrating that a director is "loyal to, beholden to, or

---

[44] Dkt. 20 ("Pl.'s Ans. Br.") at 10 ("Plaintiffs [*sic*] are not proceeding on the argument that there is a controlling shareholder."); Hrg. 46:6–7 ("We concede there's no controlling shareholder.").

[45] *See* Pl.'s Ans. Br. 11 ("Plaintiff is not taking the position that the Director-Defendants are interested. Each fractional share will be cashed-out at the same price.").

[46] *Id.* at 10 ("Plaintiff is challenging the Reverse Stock Split in which, as alleged, the board of directors are [*sic*] not independent."); Hrg. 46:7–9 ("We proceeded on the argument that the directors are not independent.").

otherwise influenced by an interested party" to demonstrate she is incapable of evaluating the decision in question on the merits. *Frederick Hsu*, 2017 WL 1437308, at *26.

A director may be beholden to an interested party through "personal or other relationships," *In re Oracle Corp. Deriv. Litig.*, 824 A.2d 917, 938–39 (Del. Ch. 2003) (internal quotations omitted), but "[a]llegations of mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence," *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1050 (Del. 2004).

> Our law is clear that mere allegations that directors are friendly with, travel in the same social circles, or have past business relationships with the proponent of a transaction or the person they are investigating, are not enough to rebut the presumption of independence. Rather, the Supreme Court has made clear that a plaintiff seeking to show that a director was not independent must meet a materiality standard, under which the court must conclude that the director in question's material ties to the person whose proposal or actions she is evaluating are sufficiently substantial that she cannot objectively fulfill her fiduciary duties.

*In re MFW S'holders Litig.*, 67 A.3d 496, 509 (Del. Ch. 2013) (citation omitted), *aff'd sub nom. Kahn v. M & F Worldwide Corp.*, 88 A.3d 635 (Del. 2014). The court must "consider all the particularized facts pled by the plaintiffs about the relationships between the director and the interested party in their totality and not in isolation from each other, and draw all reasonable inferences from the totality of those facts in favor of the plaintiffs." *Delaware Cty. Emps. Ret. Fund v. Sanchez*,

18

124 A.3d 1017, 1019 (Del. 2015). "But the allegations must be sufficient to demonstrate a *substantial reason* to find that a director cannot make a decision with only the best interests of the corporation in mind." *Teamsters Loc. 237 Additional Sec. Benefit Fund v. Caruso*, 2021 WL 3883932, at \*14 (Del. Ch. Aug. 31, 2021) (quoting *Oracle*, 824 A.2d at 938) (internal quotations and alteration omitted).

Plaintiff contends that the Director Defendants were not independent because they have "a web of relationships with the shareholders who remain with the Company," rendering them "unable to independently . . . determine the 'fair price' [of] the fractional shares."[47] According to Plaintiff, these relationships emanate from events that occurred almost 30 years ago, which he refers to as the "Cooper Companies scandal."[48]

The Complaint alleges that non-party Gary A. Singer, the brother of defendant Steven Singer, was chairman of The Cooper Companies, Inc. ("Cooper") when he was indicted in 1992 for engaging in "an extensive criminal scheme to profit from insider tips on junk bond trades."[49] Gary Singer and Cooper were eventually convicted of "various criminal counts, including fraud."[50] In a parallel civil matter,

---

[47] *Id.*

[48] *See* Compl. ¶¶ 10, 12, 13; *see also* Pl.'s Ans. Br. 23, 29–30.

[49] Compl. ¶ 3.

[50] *Id.*

the SEC sued Gary Singer; Steven Singer, who served as Cooper's Chief Operating Officer; Karen Singer, wife of Gary Singer; and Cooper for securities fraud.[51] In 1997, Gary Singer reached a settlement with the SEC that permanently barred him from serving as an officer or director of a public company.[52] Plaintiff argues that, because Gary Singer cannot serve as a public company's officer or director himself, "he uses his wife non-party Karen Singer, son non-party Julian Singer and brother director defendant Stephen G. Singer to execute activist strategies with various small-cap public companies traded on pink sheets."[53] As noted above, Plaintiff does not allege that Gary Singer or his collective family constitutes a controlling stockholder or controlling stockholder group. The Complaint contains no well-pleaded allegations that Gary Singer had any involvement in the initiation, development, or implementation of the Reverse Split or its terms. The Complaint is also bereft of any facts suggesting any relationship or similarity between the 30-year-old, long-settled "Cooper Companies scandal" and the Reverse Split.

Plaintiff also points to CCUR's relationships with companies that are connected to members of Gary Singer's family. The Complaint alleges that JDS1, LLC ("JDS1"), which held 39.7% of CCUR's stock before the Reverse Split, "was

---

[51] *Id.* ¶¶ 4, 10, 13.

[52] *Id.* ¶ 2 & n.2.

[53] *Id.* ¶ 2; Pl.'s Ans. Br. 20.

formed . . . for the purpose of pursuing an activist investment strategy with the Company."[54]  Plaintiff does not assert that this "activist investment strategy" involved or is related to the Reverse Split.  Julian Singer is the managing principal of JDS1.[55]  On February 14, 2019, CCUR entered into a management agreement with CIDM LLC ("CIDM"), under which CIDM contracted to "(i) provide[] the Company with advisory services with respect to the management and allocation of the Company's assets and (ii) exercise[] discretionary management authority over the Company's trading portfolio of marketable securities."[56]  Under the management agreement, CIDM earns an annual management fee, calculated as 2% of the Company's assets, and a 20% performance fee.[57]  Julian Singer also owns and manages CIDM.[58]  The Complaint, however, does not allege any connection between Julian Singer and the Director Defendants apart from his being Steven Singer's nephew.[59]  The Complaint does not demonstrate the relevance of the events

---

[54] Compl. ¶ 5.

[55] *Id.*

[56] *Id.* ¶ 6.

[57] *Id.*

[58] *Id.*

[59] The Complaint alleges that JDS1, Dimensional Fund Advisors LP, the Director Defendants, and the Company's officers collectively went from owning an approximate 48.5% minority stake in the Company before the Reverse Split to an approximate 53% majority stake following the transaction.  Compl. ¶ 20.  Plaintiff has not pleaded that this group of stockholders constituted a control group.  Plaintiff also fails to explain

21

of 30 years ago to the present dispute other than Steven Singer's participation in both of them.

Even if the Singer family had some interest that could be imputed to Steven Singer and rebut the presumption of his independence, the Plaintiff has not alleged facts to overcome the presumption as to the other two directors. The allegations challenging Pons and Nicol's independence are sparse. Pons is a director at SeaChange International, Inc.; Nicol sits on the board of directors at Evolving Systems, Inc., where Julian Singer is also a director.[60] The Complaint does not describe the business of these companies, nor does it allege that these companies conduct business that is related to CCUR. Karen Singer is the "largest shareholder" of both companies.[61] The Complaint, however, does not allege that Karen Singer is a controller of either company. Indeed, the Complaint does not allege anything about the percentage of her ownership of either company. There are no allegations that she has the power to remove either Pons or Nicol from their directorships at any company or influence their compensation. At oral argument Plaintiff's counsel conceded as much, arguing only that Karen Singer "could potentially" have such

Dimensional Fund Advisors LP's connection to the other members of this group or how this arbitrary grouping of stockholders creates a reasonable inference that any of the Director Defendants lacked independence.

[60] Compl. ¶¶ 10, 11.

[61] *Id.* ¶¶ 10, 11.

22

removal power, which he insists is "enough to get us past the motion to dismiss."[62]

Not so. Even assuming that Plaintiff's theory that the Singers lobbied for the Reverse Split while harboring a conflicted ulterior motive is viable—it is not—there are no well-pleaded allegations suggesting that either Pons or Nicol lacked independence from the Singer family.

### 2. Is it Reasonably Conceivable that the Board Breached its Fiduciary Duties?

Under the business judgment rule, Plaintiff must rebut the presumption that the Board's business decision was "rational in the sense of being one logical approach to advancing the corporation's objectives." *Dollar Thrifty*, 14 A.3d at 598. The Company's certificate of incorporation contains an exculpatory provision that extends as broadly as 8 *Del. C.* § 102(b)(7) allows.[63] Therefore, to survive the motion to dismiss, Plaintiff must allege that the Director Defendants either breached their respective duties of loyalty or acted in bad faith. *See In re Essendant, Inc. S'holder Litig.*, 2019 WL 7290944, at *7 (Del. Ch. Dec. 30, 2019) (citing *Cornerstone*, 115 A.3d at 1175, 1179–80). Plaintiff makes no attempt to rebut the business judgment rule, fully resting on his argument that the directors lacked

---

[62] Hrg. 50:13–51:7.

[63] Defs.' Op. Br., Ex. C, art. Eleventh.

23

independence.[64] Plaintiff concedes that if the Complaint lacks sufficient allegations to question the independence of Nicol and Pons, Count I is subject to dismissal.[65] Therefore, because Plaintiff has not alleged facts creating a reasonable inference to question the independence of a majority of the Board, Count I is dismissed.

## C.    The Alleged Violation of Section 155

In addition to his claim against the Board for breach of fiduciary duty, Plaintiff asserts a direct claim against the Company for violating Section 155 of the DGCL. Section 155 provides, in pertinent part:

> A corporation may, but shall not be required to, issue fractions of a share. If it does not issue fractions of a share, it shall (1) arrange for the disposition of fractional interests by those entitled thereto, (2) pay in cash the fair value of fractions of a share as of the time when those entitled to receive such fractions are determined or (3) issue scrip or warrants in registered form (either represented by a certificate or uncertificated) or in bearer form (represented by a certificate) which shall entitle the holder to receive a full share upon the surrender of such scrip or warrants aggregating a full share.

---

[64] *See* Pl.'s Ans. Br. 11 ("Because neither the business judgment rule nor the exculpatory provision in the Company's certificate of incorporation applies when the directors lack independence, Count I of the Complaint should not be dismissed.").

[65] Hrg. 51:9–19:

> THE COURT: . . . would you agree with me that if I conclude that your complaint does not have well-pleaded allegations, that two of the three directors lack independence from the folks that you've identified in your complaint as the ones to which they were beholden, that, under *Cornerstone*, the fiduciary duty claim must be dismissed?
>
> ATTORNEY ANDERSEN: Yeah, I agree. If Your Honor thinks I don't allege enough for Pons and Nicol because it's a three-member board, then yes, you can dismiss.

8 *Del. C.* § 155. Plaintiff alleges that CCUR violated Section 155(2) because the Reverse Split's $2.86 per pre-split share cash consideration was not fair value as required under the statute.

Defendants argue Plaintiff's statutory claim fails because Section 155 does not provide for a freestanding claim against the Company and that the payment of $2.86 per cashed-out share constituted fair value. Both of these arguments rely heavily on two cases from this court, one of which was also affirmed in a written opinion by the Delaware Supreme Court. The court addresses those decisions in turn.

In *Applebaum v. Avaya, Inc.* (*Applebaum II*), 812 A.2d 880 (Del. 2002), the defendant corporation, Avaya, sought to cash out stockholders owning a small number of shares in the company to avoid administrative expenses.[66] The company elected to do so through a reverse stock split to be followed immediately by a forward stock split at the reciprocal ratio as the reverse split. Stockholders authorized the board to effect the reverse split at either a 1-for-30, 1-for-40, or 1-for-

---

[66] Avaya's capital structure was the product of two spin-off transactions. At the time of the reverse/forward split proposal, Avaya's stock was one of the most widely held on the New York Stock Exchange. *Applebaum II*, 812 A.2d at 883. "Approximately 868,000 registered shareholders of Avaya stock own[ed] fewer than 30 shares, 919,000 own[ed] fewer than 40 shares, and 947,000 own[ed] fewer than 50 shares. *Applebaum v. Avaya, Inc.* (*Applebaum I*), 805 A.2d 209, 210 (Del. Ch. 2002), *aff'd*, 812 A.2d 880 (Del. 2002). The company incurred costs of more than $7 million per year to maintain the accounts and distribute the required mailings for stockholders holding fewer than 50 shares. *Id.*

50 ratio. Stockholders holding more than the minimum number of shares would not be cashed out, even if they held a number of shares not evenly divisible by the split ratio. Instead, their fractional interests would be converted back into whole shares of stock in the forward split.

Stockholders also authorized the company to compensate cashed-out stockholders through one of two possible methods: (1) combine the fractional interests and sell them as whole shares in the open market or (2) pay in cash the value of the fractional interests based on the trading price of Avaya stock averaged over the ten-day period preceding the reverse split. These two methods were designed to comply, respectively, with Sections 155(1) and 155(2) of the DGCL.

The plaintiff argued that paying an average trading price for cashed-out shares did not constitute fair value under Section 155(2). The plaintiff pointed to decisions of this court rejecting the payment of a market price under Section 155(2) because the stock was not traded on an active market. The plaintiff also pointed to the appraisal statute, 8 *Del. C.* § 262, which entitles a dissenting stockholder demanding appraisal to the payment of "fair value" for its shares in a merger. The appraisal statute provides that "[i]n determining such fair value, the Court shall take into account all relevant factors." 8 *Del. C.* § 262(h). The plaintiff maintained that "the words 'fair value' mean the same thing when used in Section 155 as in Section 262." *Applebaum I*, 805 A.2d at 215. The plaintiff argued that market price alone was not

fair value under Section 155(2) because, under Section 262, "market price is only one factor that goes into determining 'fair value,'" and "the trading price of a share of stock includes an inherent minority discount . . . that must be backed-out to derive 'fair value.'" *Id.* (internal quotations omitted).

This court granted the defendants' motion for summary judgment and denied plaintiff's cross-motion, holding that the average market price for Avaya common stock over a ten-day period constituted fair value under Section 155(2). In affirming this court's decision, the Delaware Supreme Court held that the Court of Chancery "correctly concluded that a well-informed, liquid trading market will provide a measure of fair value superior to any estimate the court could impose." *Applebaum II*, 812 A.2d at 890 (citing *Appelbaum I*, 805 A.2d at 215–16). The Supreme Court held that market price constituted fair value in that case because Avaya stock was "actively traded on the NYSE" and that a ten-day average had been "recognized as a fair value compromise that will hedge against the risk of fluctuation." *Id.* at 890–91. The Court also emphasized that the transaction had not been initiated by a controlling stockholder to cash out minority stockholders. In addition, the Court noted that stockholders could entirely avoid having any of their shares cashed out if they purchased a sufficient number of shares to survive the initial reverse split or use the payment for their cashed-out interests to reacquire shares in the market. *Id.* at 892.

In accepting market price as fair value under the circumstances of that case, the *Applebaum II* Court distinguished—but did not reject—cases of this court that declined to accept market price as fair value under Section 155(2), where the price was selected by a majority stockholder or where a controlling stockholder sought to apply a private company discount in seeking to squeeze out the minority. *Applebaum II*, 812 A.2d at 890 (citing *Chalfin v. Hart Hldgs. Co., Inc.*, 1990 WL 181958 (Del. Ch. Nov. 20, 1990), and *Metro. Life Ins. Co. v. Aramark Corp.*, 1998 WL 34302067 (Del. Ch. Feb. 5, 1998)). The Supreme Court was clear with reference to Section 155(2): "The court cannot defer to market price as a measure of fair value if the stock has not been traded actively in a liquid market." *Id.* (citing *Chalfin*, 1990 WL 181958, at *4–5).

Establishing a violation of Section 155(2), however, does not automatically entitle a stockholder to an appraisal under Section 262. In *Applebaum II*, the Supreme Court emphasized that the meaning of fair value under Section 155(2) was not identical to the concept of fair value in Section 262. In doing so, the Court pointed to the legislative history of Sections 155(2) and 262, concluding that the legislature "could not have intended Section 155(2) to have the same meaning as the fair value concept employed in Section 262." *Id.* at 892. Appraisal is "a narrow statutory right that seeks to redress the loss of the stockholder's ability under the common law to stop a merger." *Id.* at 893. The reverse/forward split authorized

28

under Section 155 did "not present the same problem" and was "ill-suited for the same solution provided for in Section 262." *Id.*

Although the Court held that a Section 155(2) fair value inquiry does not mirror a Section 262 appraisal remedy, the "inquiry may resemble a Section 262 valuation" in certain circumstances. *Id.* at 891. The Court specifically cited instances involving controlling stockholders. *Id.* at 891–92 (citing *Chalfin* and *Metropolitan*).[67]

Nine years later, in *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442 (Del. Ch. 2011), Vice Chancellor Laster analyzed and applied the teachings of *Applebaum*. In *Reis*, a controlling stockholder and interested board effected a freeze out of the minority through a reverse stock split. There was no active market for the shares and the board set the Section 155(2) fair value price using no procedural protections. The plaintiff alleged the corporation violated Section 155(2) by not paying fair value

---

[67] *Chalfin* and *Metropolitan* both involved controlling stockholders seeking to freeze out minority stockholders through a reverse stock split. In *Chalfin*, the defendants abandoned the transaction in the face of a legal challenge. *Chalfin*, 1990 WL 181958, at *3. In *Metropolitan*, the court granted a preliminary injunction, noting it was inappropriate to apply a private company discount in establishing the cash-out price for fractional interests. The court, in a bench ruling, applied a fiduciary duty analysis and held that the defendants were not likely to satisfy their burden under the entire fairness standard. *Metro. Life Ins.*, 1998 WL 34302067, at *2–3.

and that the board and controlling stockholder violated their fiduciary duties in effecting the reverse split.

In a post-trial opinion, the Vice Chancellor discussed the intersection between a statutory violation of Section 155(2) and the fiduciary duties of those who effect the transaction. At an earlier stage in the case, the defendants argued that their conduct was protected by the business judgment rule and that the plaintiff should only be permitted to proceed under a statutory claim for "fair value" under Section 155(2). Vice Chancellor Laster rejected that argument as seeking an "appraisal-style proceeding" to obtain fair value, which *Applebaum II* did not authorize. *Reis*, 28 A.3d at 455. Instead, the court concluded that the reverse split was effected by a controlling stockholder and interested board and, therefore, subject to review under the entire fairness standard.

The court acknowledged that the defendants' conduct would be "twice tested," under the statute and by equity, observing:

> Responsibility for determining fair value [under Section 155(2)] is allocated to the corporation. Under Section 141(a) of the DGCL, the authority to make that determination rests with the board. As in other contexts, a stockholder who seeks to challenge the board's decision must plead and subsequently prove that the board acted wrongfully. A reviewing court's role is to ensure that the corporation complied with the statute *and* acted in accordance with its fiduciary duties.

*Id.* at 456–57 (emphasis added).

30

In explaining the appropriate judicial framework to review the reverse split, the court focused on the fiduciary duty standards of review. Because the transaction in *Reis* involved a controlling stockholder, the court held that the entire fairness standard applied.[68] Nevertheless, the court also considered the appropriate standard where a reverse split is not initiated by a conflicted controller in an end-stage transaction. The court opined that "[a] disinterested and independent board's decision to pay cash in lieu of fractional shares . . . should be subject to enhanced scrutiny." *Id.* at 459. The court found this to be the appropriate framework under *Applebaum II*, but recognized that the Supreme Court did not explicitly articulate such a framework. Within this framework "it is reasonable for a board to use market value to determine the price paid for fractional interests when there is no controlling stockholder *and the stock is widely traded*." *Id.* at 459–60 (emphasis added). "In other circumstances, exclusive reliance on the market price to determine fair value for purposes of Section 155(2) might not be reasonable." *Id.* at 460.

*Reis* indicates that enhanced scrutiny under *Revlon* is the appropriate standard to review a corporation's decision to pay cash for fractional interests in an end stage

---

[68] The court ultimately found that the cash-out price for fractional interests was not fair value. Although it acknowledged that the monetary remedy under entire fairness could exceed the remedy available in a Section 262 appraisal, the court concluded that the reverse split did not call "for a remedy other than an award of fair value" and continued by engaging in "the same essential inquiry as in an appraisal." *Reis*, 28 A.3d at 467–78 (internal quotations omitted).

transaction under Section 155(2) if the board is disinterested and independent.[69]  In this case, however, Plaintiff did not argue that his fiduciary duty claim was subject to enhanced scrutiny as an alternative to his entire fairness argument.  Thus, the question becomes whether he may pursue a standalone statutory claim.

Defendants argue that *Applebaum II* and *Reis* preclude a stockholder from maintaining a freestanding claim asserting a violation of Section 155.[70]  That argument overstates the holdings of those cases.  Neither *Applebaum II* nor *Reis* expressly held that a stockholder could not assert a direct claim against a corporation for violating Section 155.  Defendants rely on the discussion in those opinions emphasizing that Section 155(2) does not entitle a stockholder to the equivalent of a Section 262 appraisal determination whenever fractional interests are cashed out.[71]  But neither this court nor the Delaware Supreme Court held that there is no standalone cause of action for a statutory violation.  Indeed, the court in *Reis* recognized that the court is tasked with ensuring that the board complied with Section 155 in addition to its fiduciary duties.  Section 155(2) directs a board to pay

---

[69] A corporation does not owe fiduciary duties to the stockholders.  *In re Orchard Enterprises, Inc. S'holder Litig.*, 88 A.3d 1, 54 (Del. Ch. 2014).  Thus, the only vehicle through which a stockholder could recover against a corporation in a challenge through a reverse split would appear to be through a statutory claim.  In *Reis*, the court held the directors and the corporation jointly and severally liable for the entire judgment, 28 A.3d at 479, meaning the corporation was liable for violation of Section 155(2).

[70] Defs.' Op. Br. 21–22.

[71] *See* Defs.' Reply Br. 14–16.

fair value for stockholders' fractional interests. In *Applebaum II*, the Court acknowledged that a fair value inquiry under Section 155(2) "may resemble a Section 262 valuation if the controlling stockholder will benefit from presenting a suspect measure of valuation, such as an out-dated trading price, or a wrongfully imposed private company discount." *Applebaum II*, 812 A.2d at 891. *Applebaum II* did not preclude such a standalone statutory claim under Section 155.

Plaintiff's concessions at argument were fatal to his narrow fiduciary duty claim, but they do not doom his statutory claim on a motion to dismiss. *Reis* and *Appelbaum II* recognize that, although Section 155(2) does not entitle a stockholder challenging a payment of cash for fractional interests to a Section 262 appraisal, it does not foreclose a statutory claim in appropriate circumstances. Where, as here, the company pays cash based on a market price for a stock that is not widely traded in an end stage transaction, there may be reason to doubt the reasonableness of that determination. *Applebaum II*, 812 A.2d at 890 ("The court cannot defer to market price as a measure of fair value if the stock has not been traded actively in a liquid market."); *Reis*, 28 A.3d at 460 ("exclusive reliance on the market price to determine fair value for purposes of Section 155(2) might not be reasonable").

The Company has acknowledged that its stock price is not widely traded. In its March 26, 2021 Information Statement, the Company disclosed that "the thin trading market in its Common Stock has not provided liquidity to [its] stockholders,"

33

"[a]ttempts by Company stockholders to achieve liquidity in the existing trading market would be frustrated due to the low average daily trading volume of the Company's Common Stock on the OTCQB," "only a small number of shares could be purchased or sold on the OTCQB without the risk of significantly increasing or decreasing the trading price," and "the Company had not significantly realized the benefits associated with being a public company, including access to the public capital markets and stockholder liquidity."[72]   The Company also specifically disclosed that "[o]ver the past 12 months, very little trading has taken place in the Company's securities, affording stockholders little liquidity for their shares."[73]   In their briefing, Defendants backtrack from these disclosures, arguing that "although the market for CCUR was not as liquid as publicly traded corporations listed on the New York Stock Exchange, it was still plenty liquid enough to allow the use of market price to capture 'fair value.'"[74]   The March 2021 Information Statement belies the position Defendants take in their brief:

> [T]he current public market for the Company's Common Stock is highly illiquid. As a practical matter, there currently exists very little liquidity for the Company's Common Stock; therefore, the Board and Company Affiliates believe any further losses of liquidity will have little effect on unaffiliated stockholders and will be outweighed by the

---

[72] Mar. 2021 Information Statement at 13, 14, 18.

[73] *Id.* at 23.

[74] Defs.' Op Br. 24.

> benefits of terminating its registration and periodic reporting obligations.
>
> . . .
>
> The potential loss of liquidity in shares of the Company's Common Stock does not appear to be a significant loss given the historically small trading volume of the Company's Common Stock over the past 12 months.[75]

CCUR represented that its stock was so infrequently traded that taking the Company private would have a negligible impact on stockholders' liquidity. The myriad Company disclosures provide more than enough support for the proposition that CCUR's stock was not actively traded.

Defendants also argue that their reliance on ValueScope's opinion, which determined that $2.86 per share was fair to the cashed-out stockholders is further evidence of its fair value determination. ValueScope pegged its opinion to the VWAP of CCUR stock during the two-week period after the Company disclosed the $13.8 million write down. This was materially different from the approach it took in December 2020, using an average derived over a six-month, one-month, and 18-day period. The court cannot defer to the market price of CCUR on a motion to dismiss.

ValueScope also conducted a net asset value approach ("NAV"), which "assumed a combined 45% to 50% discount . . . with a midpoint of 47.5%" to reach

---

[75] Mar. 2021 Information Statement at 26, 28.

a valuation of $2.85 per share.[76]  Plaintiff has challenged this valuation as having improperly factored lack of control and marketability into its discount.[77] ValueScope's application of a marketability discount seems to further undermine reliance on the market price of CCUR's common stock.  In any event, the parties' dispute over the appropriateness of applying discounts to a NAV analysis may become pertinent at a later stage of this case.[78]

Under the circumstances of this case, it is reasonably conceivable that the Company's selection of a ten-day trading average of CCUR stock on the OTC was not fair value under Section 155(2).  This is not to say that at a later stage of this case the Company will not be able to establish $2.86 per share as the appropriate payment for cashed-out fractional interests.  At this stage, however, giving Plaintiff the

---

[76] *Id.* at A-2.

[77] Compl. ¶ 30.

[78] Defendants argue that it was appropriate for ValueScope to apply corporate-level discounts for lack of marketability and control in its NAV analysis, citing *Tri-Continental Corp. v. Battye*, 528, 74 A.2d 71 (Del. 1950) and *Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137 (Del. 1989).  *But see Borruso v. Commc'ns Telesystems Int'l*, 753 A.2d 451, 459–60 (Del. Ch. 1999) (declining to accept a valuation for a non-publicly traded company that applied a discount for lack of liquidity, rejecting it even "at the 'corporate level,'" and reading *Cavalier Oil* "as prohibiting such a discount"); *Gearreald v. Just Care, Inc.*, 2012 WL 1569818, at *11 (Del. Ch. Apr. 30, 2012) (citing *Borruso* for the proposition that "a general liquidity discount cannot be applied in an appraisal proceeding," and explaining that "[s]uch a discount generally relates to the marketability of the company's shares and is therefore prohibited").

benefit of all reasonable inferences, the court cannot conclude that Plaintiff has failed to state a claim under Section 155(2).

### D.     Motion to Strike

Defendants have moved to strike paragraphs 2–5 and 10–13 of the Complaint. Those paragraphs refer to the allegations of the "Cooper Companies scandal." Court of Chancery Rule 12(f) provides that the court "may order stricken from any pleading any . . . redundant, immaterial, impertinent, or scandalous matter." Ct. Ch. R. 12(f). Defendants argue that the offending paragraphs are irrelevant to Plaintiff's claims and prejudicial.

"Motions to strike are not favored, and the granting of such a motion is permissive, not mandatory; thus, such motions are granted sparingly and only when clearly warranted with all doubt being resolved in the nonmoving party's favor." *Quereguan v. New Castle County*, 2010 WL 2573856, at *5 (Del. Ch. June 18, 2010) (internal quotations and citations omitted). "The test employed in determining a motion to strike is: (1) whether the challenged averments are relevant to an issue in the case and (2) whether they are unduly prejudicial." *Id.* (internal quotations omitted).

The court has granted Defendants' motion to dismiss the fiduciary duty claim. As discussed above, the court concluded that Plaintiff's allegations concerning the events of 30 years ago involving Cooper and Gary Singer did not create a reasonable

37

inference that a majority of the Board lacked independence. Nevertheless, the court cannot conclude that the allegations were completely irrelevant to Plaintiff's unsuccessful legal theory. Nor are those allegations unduly prejudicial. The only Defendant referenced in the offending paragraphs of the Complaint is Steven Singer. The court has dismissed the only claim against him. Recognizing that motions to strike are strongly disfavored, the court denies the motion.

## III. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss Count I is GRANTED; the motion to dismiss Count II is DENIED. Defendants' motion to dismiss for lack of standing and motion to strike are DENIED.

**IT IS SO ORDERED.**