**Milton APPLEBAUM, Plaintiff,**

v.

**AVAYA, INC., Jeffrey A. Harris, Franklin A. Thomas, Henry B. Schacht, Daniel C. Stanzione, Mark Leslie, Donald K. Peterson, and Patricia F. Russo, Defendants.**

**C.A. No. 19342.**

Court of Chancery of Delaware,
New Castle County.

Submitted: April 29, 2002.
Decided: June 27, 2002.
Corrected: July 1, 2002.

Paul A. Fioravanti, Jr., Ronald A. Brown, Jr., Prickett, Jones & Elliott, P.A., Wilmington, and Arthur T. Susman, Susman & Watkins, Chicago, IL, for Plaintiff.

Jesse A. Finkelstein, Zoe Forrester, Daniel A. Dreisbach, Richards, Layton & Finger, Wilmington, and Paul J. DiMaio, Avaya, Inc., Basking Ridge, NJ, for Defendants.

### OPINION

LAMB, Vice Chancellor.

Before the court are cross motions for summary judgment in a lawsuit to enjoin a Delaware corporation from executing a re-verse/forward stock split intended to cash out shareholders below a certain ownership level. For the reasons that follow summary judgment is granted for the defendants.

## I.

Avaya, Inc. ("Avaya" or the "Company") is a provider of communications systems and software for enterprises, including businesses, government agencies, and other organizations. Avaya became a public corporation as the result of its September 30, 2000 spin-off from Lucent Technologies, Inc. ("Lucent") in which each holder of Lucent common stock received one share of Avaya common stock for every twelve shares of Lucent stock owned. Because Lucent was itself very widely owned as a result of its having been spun off earlier by AT&T, Avaya is one of the most widely held stocks listed on the New York Stock Exchange ("NYSE"). Avaya has approximately 3.3 million holders of its common stock ("Common Stock"), holding, on average, fewer than 90 shares. Approximately 868,000 registered shareholders of Avaya stock own fewer than 30 shares, 919,000 own fewer than 40 shares, and 947,000 own fewer than 50 shares. Moreover, approximately 1,865,000 shareholders hold shares through brokers or beneficial accounts.

It costs Avaya $3.9 million per year to maintain the small accounts (those holding fewer than 50 shares) of registered shareholders. In addition, the Company must spend $3.4 million per year to distribute the required mailings to holders with fewer than 50 shares in street name through a bank or broker. Maintaining these small accounts is therefore costly and burdensome. This problem is not unusual for recently spun-off companies, but it is particularly acute in the case of Avaya, given

the extraordinarily large stockholder base of Lucent.

To reduce these large annual outlays, Avaya has proposed, and its stockholders have approved, a reverse/forward stock split ("Reverse/Forward Split(s)" or "Proposed Transaction"). On January 8, 2002, the Company distributed its Proxy Statement for the 2002 Annual Meeting of Shareholders of Avaya (the "2002 Annual Meeting"). Among the matters to be considered at the 2002 Annual Meeting was a proposal to amend Avaya's Restated Certificate of Incorporation to allow one of three Reverse/Forward Splits that the Avaya board of directors (the "Board") had recommended in the Proxy Statement. The Proxy Statement disclosed, as follows:

> The Board of Directors has authorized, and recommends for your approval, *each* of the three alternative reverse/forward stock split transactions described below:
> - a reverse 1–for–30 stock split followed immediately by a forward 30–for–1 stock split of the Common Stock;
> - a reverse 1–for–40 stock split followed immediately by a forward 40–for–1 stock split of the Common Stock;
> - a reverse 1–for–50 stock split followed immediately by a forward 50–for–1 stock split of the Common Stock.

The Board recommended the three alternative ratios for shareholder approval with the stated intention that it would determine at a future time which, if any, of the Proposed Transactions would be of most utility to the Company.

Whichever of the three alternative Proposed Transactions is chosen by the Board will be accomplished as follows:

> The Reverse/Forward Split includes both a reverse stock split and a forward

stock split of the Common Stock.... [T]he Reverse Split is expected to occur at 6:00 p.m. on the Effective Date and the Forward Split is expected to occur at 6:01 p.m. on the Effective Date.

The effective date of the Proposed Transaction, once chosen, will be announced publicly and posted on Avaya's web site.

Once the Board determines which alternative to implement, the shareholders with fewer than the applicable minimum number of shares [1] will be cashed out:

> Any registered shareholder who holds fewer than the Minimum Number of shares of Common Stock in his or her account at the time of the Reverse Split (also referred to as a "Cashed–Out Shareholder") will receive a cash payment instead of fractional shares.

Shareholders owning more than the Minimum Number will not be affected by the Reverse/Forward Split. When the dust settles, they will own exactly the same number of shares of Common Stock as they did before the Proposed Transaction.

The Company intends to treat persons holding Common Stock in street name, or through a nominee, "in the same manner as shareholders whose shares are registered in their names." However, the Proxy Statement recognizes that nominees may have different procedures. Holders of shares held in street name are advised to contact their nominees to be informed of any procedures they may need to follow in order to get the same treatment as registered shareholders.

According to Avaya, the Proposed Transaction promises significant benefits to the small holders who will be cashed out. Avaya's common stock has recently traded in a range of $4.15 to $7 per share.

---

1. The minimum number of shares is the number of shares at which the Board decides to implement the Reverse/Forward Split, *i.e.*, 30, 40 or 50 shares of Common Stock (the "Minimum Number").

Thus, for someone holding fewer than the Minimum Number of shares, the transaction cost of selling his or her Common Stock would consume a large portion of the total value of those shares. The Reverse/Forward Split will provide a cost-effective way for holders of fewer than the Minimum Number of shares to cash out their small investment in Avaya because the Company will pay all the associated transaction costs. The Proposed Transaction thus allows small holders to achieve what otherwise would be impossible—a sale of their positions at market price.

Avaya also points out that any stockholder wishing to maintain a continuing interest in the Company easily may do so. Stockholders have advance notice of the Proposed Transaction by virtue of the Proxy Statement and will have advance notice of its effective date through a public announcement and a posting on Avaya's web site. As a result, everyone owning fewer than the Minimum Number of shares will have the opportunity to purchase additional shares on the open market in order that their holdings are at least equal to the Minimum Number, and thus remain an owner of Avaya. Alternatively, shareholders who are cashed out will be able to reinvest the cash proceeds from the Proposed Transaction in Avaya Common Stock through trades on the NYSE.

One day after the Proxy Statement was distributed to shareholders, the plaintiff filed his lawsuit objecting to the Reverse/Forward Split and seeking declaratory and injunctive relief. On February 26, 2002, the shareholders voted convincingly in favor of each of the three alternative proposals. Based on an agreement between the parties, the defendants have committed to delay implementation of the Reverse/Forward Split until a ruling by this court on the pending cross-motions for summary judgment.

## II.

This dispute requires the court to consider the application and meaning of Section 155 of the Delaware General Corporation Law ("DGCL") in the context of the Reverse/Forward Split proposed by Avaya.[2] Section 155, the full text of which is set forth at note 2, governs the treatment of fractional shares by a Delaware corporation choosing not to issue fractional shares in a variety of transactions. The plaintiff advances several arguments.

The first argument made is that Section 155 does not permit a corporation, such as Avaya, to choose to issue fractional shares

---

2. 8 Del. C. § 155 ("A corporation may, but shall not be required to, issue fractions of a share. If it does not issue fractions of a share, it shall (1) arrange for the disposition of fractional interests by those entitled thereto, (2) pay in cash the fair value of fractions of a share as of the time when those entitled to receive such fractions are determined or (3) issue scrip or warrants in registered form (either represented by a certificate or uncertificated) or in bearer form (represented by a certificate) which shall entitle the holder to receive a full share upon the surrender of such scrip or warrants aggregating a full share. A certificate for a fractional share or an uncertificated fractional share shall, but scrip or warrants shall not unless otherwise provided therein, entitle the holder to exercise voting rights, to receive dividends thereon and to participate in any of the assets of the corporation in the event of liquidation. The board of directors may cause scrip or warrants to be issued subject to the conditions that they shall become void if not exchanged for certificates representing the full shares or uncertificated full shares before a specified date, or subject to the conditions that the shares for which scrip or warrants are exchangeable may be sold by the corporation and the proceeds thereof distributed to the holders of scrip or warrants, or subject to any other conditions which the board of directors may impose.").

to some stockholders but not to others in the same transaction. The plaintiff points to the fact that the initial reverse stock split will result in the creation of fractional interests both in the case of those stockholders owning fewer than the Minimum Number of shares, and all other stockholders owning a number of shares greater than the Minimum Number but not evenly divisible by the Minimum Number. The latter fractional interests will not be treated in the same manner as the former, however, because Avaya proposes to cash out the first group in accordance with subsections (1) or (2) of Section 155, while restoring the second group to the status of whole shares in the forward stock split one minute later. Plaintiff argues that this result is impermissible under Section 155 because subsections (1), (2) and (3) of that provision only operate in transactions in which the corporation "does not issue fractions of a share."

The plaintiff next argues that, even if Section 155 applies to this transaction, neither of the two methods Avaya has proposed to eliminate shareholdings smaller than the Minimum Number complies with Section 155. These methods are disclosed in the Proxy Statement relating to the Proposed Transaction, as follows: "the Board of Directors will elect either to arrange for Avaya's transfer agent to aggregate and sell these fractional shares of Common Stock on the open market, or to have Avaya pay cash for the fractional shares based on the trading value of the Common Stock that is cashed out." As to the second alternative, the Proxy Statement further discloses that the "Cashed-out Shareholders will receive a cash payment ... in an amount per share equal to the average of the closing prices per share of Common Stock on the NYSE for the period of ten consecutive trading days ending on (and including) the Effective Date, without interest."

## III.

A party is entitled to the entry of summary judgment upon a showing that there is no genuine, material issue of fact and that it is entitled to judgment as a matter of law.[3] Although the parties have crossed-moved for summary judgment, that fact "does not act *per se* as a concession that there is an absence of a factual issue."[4] Here, the parties are in agreement, and the court concurs, that there are no material issues of fact in dispute and the cross-motions present purely questions of law.

### A. Is Section 155 Available to Avaya?

In stock-for-stock mergers and transactions involving a recapitalization, it is often the case that shareholdings do not convert neatly into whole numbers of shares. Because most corporations do not issue fractional shares, the procedures in Section 155 are available to compensate stockholders for the value of shares represented by fractional interests in mergers and similar transactions. For example, Section 251(b) of the DGCL states that merger agreements may include "a provision for the payment of cash in lieu of the issuance or recognition of fractional shares, interests or rights, or for any other arrangement with respect thereto, consistent with Section 155 of this title."[5] Provisions for compensating holders of fractional shares are also necessary in the case

---

**3.** *Arnold v. Society for Savings Bancorp, Inc.,* 650 A.2d 1270, 1276 (Del.1994).

**4.** *United Vanguard Fund, Inc. v. Takecare, Inc.,* 693 A.2d 1076, 1079 (Del.1997).

**5.** Section 252(b) of the DGCL contains substantially similar language.

of recapitalizations, including reverse stock splits.[6]

The plaintiff argues that the procedures described in Section 155 are not available in this case because not *all* fractional interests are being cashed out in the Reverse/Forward Split. The plaintiff's opening brief states: "[t]he statute simply does not permit Avaya to issue fractional shares to some stockholders in a transaction and pay cash in lieu of fractional shares to other holders of the same class of stock in the same transaction." The argument on this point was initially presented as one of straightforward statutory construction: "Avaya will not qualify as a corporation that 'does not issue fractions of a share' because Avaya admits that it will issue fractional shares that are created as a result of the reverse split to stockholders who own at least the 'Minimum Number' (i.e. 30, 40 or 50 shares)." In reply, the plaintiff advances an even stricter construction of the statute as "expressly prohibit[ing] Avaya from issuing shares to some stockholders, as it claims it will do, and forcing others to accept cash."

There is, of course, no language in Section 155 expressly prohibiting Avaya from treating large and small stockholders differently. If such a requirement is to be found in Section 155, it can only be by inference or construction. Possibly the court could construe Section 155 to apply only where stockholders are treated uniformly in a transaction. However, the plaintiff has not presented any authority supporting such an inflexible construction of this statute. In addition, his effort to restrict the scope of Section 155 is at odds with Delaware Supreme Court "jurisprudence that stockholders need not always be treated equally for all purposes."[7]

This power of directors to structure corporate transactions that treat stockholders disparately strongly militates against the plaintiff's narrow construction of Section 155. Given that directors acting consistently with their fiduciary duties may draw distinctions between groups of stockholders in defining the basic economic terms of transactions (subject to a requirement that all stockholders be treated fairly), it makes no sense to construe Section 155 to require uniformity (rather than fairness) in dealing with the disposition of fractional interests created in such transactions. A leading treatise on Delaware corporation law describes the three subparts of Section 155 as "mechanics [that] simply recognize some of the devices which are usually used to deal with fractional interests created in mergers and other transactions."[8] The court will not limit the utility of these "mechanics" by needlessly restricting their availability to situations in which there is complete uniformity of treatment. Thus, the court concludes that Section 155 is available to Avaya for its Proposed Transaction.

## B. Does Avaya's Proposal Satisfy Section 155?

As discussed above, Avaya's proxy materials disclose that it intends to compensate holders of fewer than the Minimum Number of shares in one of two ways. Avaya will either cause its transfer agent to aggregate the fractional interests resulting

6. DREXLER, BLACK & SPARKS, DELAWARE CORPORATION LAW AND PRACTICE, § 17.04 at 17–26–17–28 (2001).

7. *Nixon v. Blackwell,* 626 A.2d 1366, 1376 (Del.1993); *see also Unocal Corp. v. Mesa Petroleum Co.,* 493 A.2d 946, 957 (Del.1985).

8. DREXLER, BLACK & SPARKS, *supra,* note 6, § 17.04 at 17–27.

from the initial reverse stock split and sell them on the market, after which it will distribute the proceeds of the sale (without reduction for transaction costs) to those stockholders, or it will pay cash for those fractional interests calculated by reference to the closing price of the Common Stock on the NYSE over a specified period preceding the effective date of the transaction.

The plaintiff contends that neither method conforms with the statutory requirements of Section 155. Because the parties have devoted most of their attention to the second, cash-out method, the court will consider that question first.

*1. Is Fair Market Value Equal to Fair Value in this Case?*

■ The central dispute in this case is whether Avaya's proposal to pay cash measured exclusively by the market price of the Common Stock will comply with the procedure described in Section 155(2) that it "pay in cash the fair value of fractions of a share as of the time when those entitled to receive such fractions are determined." The plaintiff's argument is, again, straightforward: that the words "fair value" mean the same thing when used in Section 155 as in Section 262 of the DGCL (the appraisal section); under Section 262, "market price is only one factor that goes into determining 'fair value';" and, finally, the trading price of a share of stock "includes an inherent minority discount ... that must be backed-out to derive 'fair value.'"

The defendants make several responses. First, they point out that merger agreements commonly provide for the payment of cash in lieu of fractional shares based on trading prices during an agreed upon time period.[9] Thus, as a matter of routine practice, "fair value" as used in Section 155 is given a different and more flexible meaning than it is under the appraisal statute. Second, they support this practice theoretically by citing authority recognizing that market value is often a reliable indicator of value that must be given some weight, even in the appraisal context.[10] Third, they refer to a decision of this court recognizing that market price might, in a given situation, be equal to fair value.[11] Finally, the defendants argue that, in the factual situation presented in this case, a decision to pay fair market value for fractional shares will fully and fairly compensate all persons holding fewer than the Minimum Number of shares.

It is relatively easy to conclude, on the uncontested facts presented in this summary judgment proceeding, that paying a cash price determined by reference to the trading price of Avaya stock over the ten trading day period preceding the Reverse/Forward Split will result in the payment of "fair value" to the holders being cashed out.[12] This is so for a number of reasons that are interdependent on each other.

- Avaya Common Stock is very widely held, has no controlling stockholder and trades on the NYSE.
- The market for Avaya Common Stock is highly liquid, having a 3–week aver-

---

**9.** Citing to DREXLER, BLACK & SPARKS, *supra* note 6, § 17.04, 17–27.

**10.** *See, e.g., Cede & Co. v. Technicolor, Inc.,* Del. Ch., C.A. No. 7129, 1990 WL 161084, Allen, C. (Oct. 19, 1990).

**11.** Citing *Chalfin v. Hart Holdings Co.,* 1990 WL 181958, 1990 Del. Ch. Lexis 188, Del.Ch., C.A. No. 11611, Jacobs, V.C. (Nov. 20, 1990).

**12.** *See, e.g., Seagraves v. Urstadt Prop. Co., 1996* WL 159626 at *5, 1996 Del. Ch. Lexis 36 at *22 (Del.Ch.)("To be reliable, market price must be established in an active market.").

age daily trading volume of 1.21 million shares.[13]

- The Proposed Transaction will not result in any significant change in these market characteristics; i.e., Avaya Common Stock will continue to be listed and traded on the NYSE and will remain a widely held and highly liquid security.
- Holders will have advance notice of the Effective Date of the Proposed Transaction and the ability to purchase a sufficient number of shares to own the Minimum Number of shares.
- Holders who are cashed-out will have the ability to repurchase Avaya Common Stock on the NYSE in order to reacquire the same ownership position they held before the transaction.
- The cash payment made for shares will not be reduced to reflect transaction costs which, in a regular sale, would amount to a significant portion of the total proceeds of sale.

The conclusion to be drawn from the combination of these factors is that the average market price for Common Stock as quoted on the NYSE in the ten days leading up to the Proposed Transaction will provide an accurate reflection of the Common Stock's value for purposes of Section 155(2).[14]

It is important to emphasize that the Proposed Transaction will not materially affect either the liquidity of the public market in Common Stock or the ability of persons who own fewer than the Minimum Number of shares to trade both before and after the transaction so as to preserve their ownership position. These circumstances are easily distinguished from those confronted in *Chalfin*,[15] relied on by the plaintiff, or from those normally found in actions arising under the appraisal statute.

In *Chalfin*, the court was faced with a 100:1 reverse stock split in which over 81% of the outside stockholders were being cashed out of a corporation that was overwhelmingly controlled by a single stockholder and had no active public market for its shares. As the court observed:

> Because share ownership has been concentrated in a small number of holders, the Company's shares have not been publicly traded for some time.... [T]here [are] no market makers making bids for the Company's shares. The primary buyer of the Company's common shares has been the Company itself.[16]

The proxy statement in that case was silent as to how the cash price to be paid for fractional interests was determined, but affidavit evidence before the court showed that the board of directors (all of whom were insiders controlled by the majority stockholder) had set the price on the basis of recent transactions in which the company had repurchased shares and non-expert estimates of the company's "intrinsic value." That price was approximately 20% lower even than book value.[17]

Because it arose in a factual context involving an effort to eliminate the public stockholders of a corporation at an unfair

---

13. http://biz.yahoo.com/p/a/av.html (visited June 27, 2002).

14. *See, e.g.,* BALOTTI & FINKELSTEIN, THE DELAWARE LAW OF CORPORATIONS & BUSINESS ORGANIZATIONS, § 5.15 at p. 5–33 (3rd ed., 2002 Supp.)(With reference to Section 155(2): "When the shares are traded on an exchange ... the mean between the high and low on the date traded ... is often used as the fair value.").

15. 1990 WL 181958, 1990 Del. Ch. Lexis 188.

16. *Id.* at *1, 1990 Del. Ch. Lexis at *2.

17. *Id.* at *1, 1990 Del. Ch. Lexis at *3.

price, *Chalfin* should not be read so broadly as to stand for the proposition that market value cannot, as a matter of law, ever adequately reflect "fair value" under Section 155(2). While the *Chalfin* court dismissed the defendants' suggestion that they had met their statutory duty under Section 155(2) to pay "fair value" by "fixing the cash-out price for fractional shares on the basis of market price," it did so because "the market price may have been depressed by the absence of any active trading and . . . was set by the issuer company, acting as the primary (if not the sole) buyer." [18] Importantly, the *Chalfin* court carefully noted that "market price may equate to fair value in a given case." [19]

For similar reasons, the court is persuaded that the law dealing with the appraisal remedy under Section 262 does not require a conclusion that a price based on NYSE closing prices over a ten-day period cannot amount to "fair value" for the purposes of Section 155(2). Case law under the appraisal statute recognizes that certain valuation methodologies based on market trading statistics of comparable companies can produce results that reflect a minority discount inherent in the market price of non-control lots of shares.[20] To determine "fair value" in an appraisal, those cases adjust the result derived by that valuation method to include a control premium. The plaintiff, of course, argues that before market value can be considered an adequate measure of "fair value"

the imposition of a similar premium is necessary in this case.

This argument ignores the fundamental difference between the circumstances leading to an appraisal under Section 262 and the factual predicate of the transaction at issue here. The cases dealing with control premiums in the context of appraisal actions all tacitly assume that the shares in question are no longer available for purchase in that same marketplace by the person whose shares are being appraised. Otherwise, the award of a premium over market would constitute an unwarranted windfall, since the stockholder could repurchase shares subject to the appraisal in the market without paying any premium. For that reason, the court is unpersuaded that the authority cited by the plaintiff supports a conclusion that, in the circumstances of this case, market price is not "fair value" for the purposes of Section 155(2).

■ The court also rejects the plaintiff's statutory construction argument that the phrase "fair value" as used in Section 155(2) must be given the same meaning as in Section 262, an argument advanced in order to invoke the appraisal-derived rule that market value cannot be the sole determinant of "fair value." [21] The general rule of statutory construction that words used in different sections of a statute should be given the same meaning, although often applied, is limited to situations where the same words are used in statutory sections that are similar in purpose and content.[22]

---

18. *Id.* at *5, n. 3, 1990 Del. Ch. Lexis at *8, n. 3.

19. *Id.*

20. *See, e.g., Borruso v. Communications Telesystems Int'l.,* 753 A.2d 451, 458 (Del.Ch. 1999)("[T]he comparable company method of analysis produces an equity valuation that inherently reflects a minority discount, as the data used for purposes of comparison is all

derived from minority trading values of the comparable companies.").

21. 8 DEL.C. § 262(h) ("In determining . . . fair value, the Court shall take into account all relevant factors.").

22. 2B, Norman J. Singer, STATUTES AND STATUTORY CONSTRUCTION § 51.02 at 199 (6th ed.2000).

Even in those circumstances, the rule is not invariably applied.[23] Sections 262 and 155 are substantially dissimilar in content and purpose. Indeed, as a general matter, there is little or no correspondence between the purpose and operation of the two statutes. Except in cases such as *Chalfin,* in which persons seek to employ Section 155 as part of a scheme to cash-out minority shareholders at unfair prices, there is no reason that case law relating to "fair value" under the appraisal law should be imported into decisions relating to "fair value" under Section 155(2). Notwithstanding this, the court recognizes that reverse stock splits can be employed as instruments of oppression and strongly endorses the holding of *Chalfin* that market value is not always an adequate measure of "fair value." In this case, however, it is.

### 2. Is Avaya's Alternate Plan to Sell Shares Permitted Under Section 155(1)?

■ Section 155(1) permits a corporation to "arrange for the disposition of fractional interests by those entitled thereto." The plaintiff contends that Avaya's alternate plan for complying with Section 155(1), by "arrang[ing] for Avaya's transfer agent to aggregate and sell [the] fractional shares of Common Stock on the open market," is not permitted by this provision of the statute. First he argues that, reading the statutory language literally, a disposition of aggregated interests by the corporation's transfer agent would be a disposition by the corporation or its agent, not a disposition "by those entitled thereto," i.e. the stockholders owning fewer than the Minimum Number of shares. Next, he argues that because the forward split will occur before any sales by the

transfer agent occur, what will be sold are not "fractional interests" at all, but reconstituted whole shares. Thus, the argument goes, Avaya's plan does not literally come within the scope of Section 155(1).

The court begins by observing that the stockholders being cashed out would have no reasonable means to aggregate or sell "fractional interests" on their own without incurring prohibitively high transaction costs. Assuming that the Minimum Number is ultimately set at 30, 40 or 50, the total market value of even the largest affected shareholding would be less than $135, $180 or $225, respectively, at recent market prices.[24] Obviously, the transaction costs associated with selling the resulting fractional interest from such a small holding would be very substantial, even if a market existed in which to execute such a transaction.[25]

In these circumstances, there is no policy justification for reading the statutory language so woodenly or hyper-technically as to prevent Avaya from arranging for the disposition of those interests by the corporation's transfer agent on behalf of those stockholders. In the eyes of equity, such sales would be "by" those sellers, as they are the persons entitled to share proportionately in the proceeds thereof.

Moreover, there is no reason why, in the context of the transaction proposed by Avaya, the court should interpret Section 155(1) as requiring the stockholders on whose behalf such sales are made to positively elect that course, since those who wish to maintain their stock ownership position are fully able to do so, both before and after the implementation of the transaction. In other words, in this case, the

**23.** *Id.* at § 46.05 at 176–77.

**24.** Based on the recent price of $4.50 per share. http://biz.yahoo.com/p/a/av/html (visited June 27, 2002).

**25.** Although Avaya Common Stock is listed for trading on the NYSE, that exchange does not trade fractional interests or shares.

automatic sale of certain fractional interests is designed to eliminate a multitude of uneconomic shareholdings, not individual shareholders, *per se.*

For these reasons, the court rejects the plaintiff's first contention that the proposed plan for the aggregation and sale of fractional interests by Avaya's transfer agent would not result in sales of fractional interests "by those entitled thereto," within the meaning of Section 155(1).

The plaintiff also argues for a narrow reading of a corporation's power to force the sale of fractional interests under Section 155(1) based on his interpretation of Section 155(3). The plaintiff argues as follows:

> The forced mass sale which Avaya claims it has the option to impose is actually something that it could only accomplish if it issued "scrip" under § 155(3). If a company issues "scrip," the statute provides that the scrip "may be sold by the corporation and the proceeds thereof distributed to the holders of the scrip." 8 *Del. C.* § 155(3). However, Avaya is not issuing "scrip." There is no basis for Avaya's proceeding under § 155(3). The language of each section is completely different. When the legislature wanted to give companies the unilateral power to sell property rights that belong to stockholders and distribute the proceeds to them, it knew how to express such power in clear and unequivocal terms.

This argument misconceives the pertinent provision of Section 155(3). The language to which the plaintiff refers does not empower the corporation to sell the scrip issued in lieu of fractional shares. Instead, it empowers the board of directors to make scrip (or warrants) issued under subsection 155(3) subject to a condition that permits the corporation to sell the underlying shares and distribute the proceeds to the holders in satisfaction of their claims against the corporation.[26] By contrast, Section 155(1) specifically contemplates the disposition of fractional interests. The only question is whether a plan of disposition under that provision must provide for some option other than the sale of those interests (or the corresponding whole shares aggregated from them) by or on behalf of "those entitled thereto." Reference to the terms of Section 155(3) relating to scrip and warrants does not provide an answer to that question and, therefore, fails to support the plaintiff's case.

The plaintiff's final argument is that the occurrence of the forward split before any sales are actually made by the transfer agent will take the Proposed Transaction outside the scope of Section 155(1) because the transfer agent will actually be selling the reconstituted whole shares, not fractional interests.[27] Thus, the argument goes, those sales will not involve "disposition[s] of fractional interests" within the meaning of Section 155(1). The Company responds by labelling this argument "hyper-technical and unrealistic," pointing out that it has long been the practice of corpo-

**26.** It seems likely that this provision was included in Section 155(3) either (i) to empower corporations effectively to "redeem" scrip or warrants in advance of their expiration date in order to protect the interests of holders who otherwise fail to engage in any transaction for the purpose of realizing the value of those securities, or (ii) to eliminate whatever instruments remain after a sufficient period of time has transpired for the holders to aggregate them and exercise them for the underlying shares.

**27.** The plaintiff also argues, as he did in connection with his challenge under Section 155(2), that the plan to sell fractional interests unlawfully discriminates among stockholders. The court rejects this argument for the same reasons given above at pp. 214–215.

rations "to aggregate these 'interests' and sell them in a market that recognizes them as whole shares."

While the effect of the subsequent forward split on the fractional interests created by the initial reverse split adds an element of theoretical complexity to Avaya's Proposed Plan, it is hard to see why the occurrence of the forward split should make Section 155(1) unavailable as a mechanism for dealing with those fractional interests. In other words, when the fractional interests are created as a result of the reverse split, they will each have a value equal to some fraction of the value of one newly constituted share. When the forward split occurs one minute later, the value of those fractional interests will certainly be increased, but the fractional interests will not be reconstituted as whole shares.[28] The transfer agent will dispose of the fractional interests by aggregating them and selling new shares representing the aggregate value of those interests. This is consistent with the manner in which fractional interests are routinely handled under Section 155(1).[29] The fact that those shares are issued to the transfer agent in exchange for the fractional interests and then sold does not mean that this process is beyond the scope of Section 155(1)'s provision allowing the "disposition" of fractional interests. Rather, it simply means that the process for disposing of fractional interests under Section 155(1) will involve the exchange of those interests, when aggregated by the transfer agent, for shares of Common Stock that are eligible for sale on the NYSE.

In this regard, the court notes again that the affected stockholders have the complete and unfettered freedom to deal in Avaya Common Stock in any manner they choose either to avoid the consequences of the Proposed Transaction or to hedge against it. That freedom substantially militates against the plaintiff's proposed reading of the statute as narrowly prescribing the proper manner for dealing with fractional interests.

### C. Will the Reverse/Forward Split Affect Beneficial Owners?

Finally, the plaintiff takes issue with the disclosure in the proxy statement that "nominees will be instructed to effect the Reverse/Forward Split for the beneficial holders." The plaintiff correctly points out that the Proposed Transaction will, as a matter of Delaware corporation law, operate only on the level of the corporation's stocklist, and will not look through it to determine the identities of those beneficial owners who choose to hold their shares in nominee form.

While it is unclear to the court whether the plaintiff's complaint is, in this respect, based on misleading disclosures or some substantive legal theory, the court is satisfied with Avaya's response that, while it intends to treat all holders in the same manner, it recognizes that the effect of the Proposed Transaction on beneficial holders is not governed by Delaware corporation law. Rather, Avaya recognizes that beneficial holders who wish to receive cash for their shares in the Proposed Transaction will need to contact their record holder to

---

**28.** Indeed, it must be the case that, as a result of the forward split, the value of the fractional interests will be increased by applying the same multiplier used in the Forward Split (i.e., either 30, 40 or 50). When the dust settles, each "fractional interest" will have a value equal to the value of the number of shares originally held in the position represented by that interest.

**29.** BALOTTI & FINKELSTEIN, *supra* note 4, § 5.15 at 5–33.

ascertain how to do so. As Avaya states in its brief:

> In countless stock-for-stock mergers, reverse splits, and other such transactions, this area is left to the record and beneficial owners to resolve. It is certainly Avaya's expectation that beneficial owners will take advantage of the opportunity; however, this is a matter between beneficial owners and their nominees. Delaware law does not purport to regulate the relationship between beneficial owners and record owners in this manner and Plaintiff points to no support for such interference.

In view of this explanation, the court is satisfied that this aspect of the Proposed Transaction is consistent with Delaware law and that the disclosures made in regard thereto are not materially misleading. Beneficial owners who wish to take advantage of the opportunity to realize a fair market value for their odd lot holdings without incurring any transaction costs will be able to resolve the mechanics of doing so with their nominees.

## IV.

For all the foregoing reasons, the plaintiff's motion for summary judgment is DENIED and the defendants' cross-motion for summary judgment is GRANTED. IT IS SO ORDERED.