# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| VMWARE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2022-0820-PAF |
| | ) | |
| MICHAEL J. WOOD, | ) | |
| | ) | |
| Defendant. | ) | |

# MEMORANDUM OPINION

Date Submitted:  February 17, 2023
Date Decided:  May 16, 2023

Elena C. Norman, Elisabeth S. Bradley, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Arturo J. González, Shaelyn K. Dawson, Camille Framroze, Meredith L. Angueira, MORRISON & FOERSTER LLP, San Francisco, California; *Attorneys for Plaintiff VMware, Inc.*

Kasey H. DeSantis, Nathan D. Barillo, FOX ROTHSCHILD LLP, Wilmington, Delaware; Neil A. Capobianco, FOX ROTHSCHILD LLP, New York, New York; *Attorneys for Defendant Michael J. Wood*.

**FIORAVANTI, Vice Chancellor**

A former employee of VMware, Inc. ("VMware" or the "Company") contends that he is owed shares of VMware common stock following his resignation from the Company. The former employee claims that when VMware acquired his former employer, Velocloud Networks, Inc. ("Velocloud"), in a 2017 merger, VMware was required to substitute unvested shares of VMware stock in exchange for his unvested restricted shares of Velocloud stock and to either repurchase or deliver the shares upon his termination from the Company. After the former employee (the defendant and counterclaim plaintiff here) resigned from VMware, the Company did not repurchase the shares and did not deliver VMware stock certificates to him.

The former employee initially commenced litigation in California. The California court stayed that action, having accepted the Company's argument that the claims must be litigated in Delaware. Thereafter, the Company filed its complaint in this action against its former employee, seeking a declaratory judgment that his unvested Velocloud shares were canceled in the merger and that VMware owes him no additional consideration relating to those shares. The former employee has filed counterclaims seeking an order requiring VMware to issue a certificate for 3,086 shares of VMware common stock and related relief.

The Company has moved to dismiss the former employee's counterclaims and for summary judgment on its declaratory judgment claim. The former employee has

moved for partial summary judgment on his claims for breach of contract and specific performance. Under the plain and unambiguous terms of the contracts at issue, the former employee's shares of unvested Velocloud stock were canceled in the merger in exchange for a stream of 17 monthly cash payments. VMware's obligation to make those payments ended when the former employee resigned from his employment with VMware after receiving only eight of those payments. Therefore, the court grants the Company's motions and denies the former employee's motion.

## I. BACKGROUND[1]

### A. Velocloud Issues a Stock Option to the Defendant.

Before it was acquired by VMware in 2017, Velocloud was a privately held startup technology company.[2] Velocloud hired Defendant Michael J. Wood as its Vice President of Marketing on May 11, 2015.[3] In connection with his hiring at Velocloud, Wood was given the opportunity to acquire equity in Velocloud under its Amended and Restated 2012 Stock Plan (the "Plan").[4]

---

[1] The facts are derived from the pleadings and documents integral thereto. Dkts. 1, 13. Exhibits attached the Complaint are cited as "Ex."

[2] Compl. ¶ 16; Answer ¶ 16.

[3] Compl. ¶ 20; Answer ¶ 20.

[4] Dkt. 42 ("Plan").

On June 30, 2015, Velocloud awarded Wood an option to acquire 230,000 shares of Velocloud common stock. The award is documented in a "Stock Option Agreement—Early Exercise" between Wood and Velocloud (the "Option Agreement").[5] At the time of the Option Agreement, the shares underlying the option were unvested.[6] The Option Agreement provided that the shares would vest over a five-year period.[7]

The Option Agreement contained an early exercise feature, allowing Wood to exercise the option and acquire shares before they vested.[8] Wood took advantage of the early exercise feature, and on October 1, 2015, exercised the option to purchase 208,330 shares of Velocloud common stock, none of which were vested.[9]

Wood executed several documents in connection with his October 1, 2015 option exercise. The first is an exercise notice (the "Exercise Notice").[10] The Exercise Notice reflects that Wood exercised his option to purchase 208,330 shares.[11] The Exercise Notice confirms that the underlying shares would contain legends indicating that the shares were restricted and had not been registered under

---

[5] Compl. ¶ 21; Answer ¶ 21; Ex. C at Ex. 1 ("Option Agreement").

[6] Compl. ¶ 23; Answer ¶ 23.

[7] Option Agreement § I.

[8] *Id.* § II(2).

[9] Compl. ¶¶ 22–23; Answer ¶¶ 22–23.

[10] Option Agreement at Ex. A ("Exercise Notice").

[11] *Id.* § 1.

the Securities Act of 1933 (the "Securities Act").[12]  Second, Wood executed an

Investment Representation Statement, which again acknowledged that the 208,330

shares he was purchasing were restricted securities under the Securities Act.[13]

Third, Wood executed a restricted stock purchase agreement for his 208,330

shares (the "RSPA").[14] The RSPA provided that if Wood's employment with

Velocloud was terminated, "the Company shall have the right and option for ninety

(90) days from such date to purchase from Purchaser . . . all of [Wood's] Unvested

Shares as of the date of such termination at the price paid by the Purchaser for such

Shares (the 'Repurchase Option')."[15]  "If the Company does not elect to exercise the

Repurchase Option . . . by giving the requisite notice within ninety (90) days

following the termination, the Repurchase Option shall terminate."[16]  The RSPA

defines "Unvested Shares" as "208,330 of those of shares of Common Stock which

have not become vested under the vesting schedule set forth in the Option

Agreement."[17]

---

[12] *Id.* § 7(a).

[13] Option Agreement at Ex. B.

[14] Option Agreement at Ex. C-1 ("RSPA").

[15] *Id.* § 1(a).

[16] *Id.* § 1(d).

[17] *Id.* at 1.

Wood also executed an assignment (the "Assignment")[18] and joint escrow instructions ("Escrow Instructions").[19] Those documents essentially assign Wood's restricted shares to the Company so as to facilitate the Company's ability to exercise its Repurchase Option of Wood's unvested shares under the terms of the RSPA. The Escrow Instructions provide in pertinent part that "[w]ithin one hundred and twenty (120) days after cessation of [Wood's] continuous employment by or services to the Company . . . [the Company] shall deliver to [Wood] a certificate or certificates representing the aggregate number of shares held or issued pursuant to the Agreement and not purchased by the Company . . . pursuant to exercise of the Company's repurchase option."[20]

## B. VMware Acquires Velocloud.

On November 1, 2017, Velocloud entered into a Merger Agreement with VMware (the "Merger Agreement"), under which Velocloud agreed to be acquired by VMware, a publicly traded company, in an all-cash deal.[21] On November 5, 2017, Wood entered into an employment agreement with VMware, effective upon the closing of the merger.[22] The merger closed on December 12, 2017, resulting in

---

[18] Option Agreement at Ex. C-2 ("Assignment").

[19] Option Agreement at Ex. C-3 ("Escrow Instructions").

[20] *Id.* § 4.

[21] Compl. ¶ 25; Answer ¶ 25; Ex. A ("Merger Agreement").

[22] Ex. E.

Velocloud becoming a wholly owned subsidiary of VMware. The treatment of Wood's Velocloud equity and stock option in the merger is central to the claims in this case.

Immediately prior to the merger, Wood held three types of equity securities in Velocloud. First, Wood continued to hold an unexercised option to purchase the remaining 21,670 shares of Velocloud common stock under the 2015 Option Agreement. Next, Wood held shares of common stock in Velocloud pursuant to the October 2015 exercise of his option. Of the 208,330 shares of common stock that he had purchased in October 2015, 148,541 shares had vested and 59,789 shares remained unvested.

The Merger Agreement explained how Velocloud securities would be treated in the merger.

### 1. Unexercised Options

Section 1.6(a) of the Merger Agreement addressed the treatment of unexercised Velocloud stock options. Vested, in-the-money options would be canceled in exchange for a cash payment.[23] Wood did not hold any such option.

Under Section 1.6(a)(2), any portion of any Velocloud option that was unvested and exercisable at a per share price less than the per share merger consideration (approximately $11.74) would be converted into an option to purchase

---

[23] Merger Agreement § 1.6(a)(1).

6

a proportional number of shares in VMware common stock.[24]  In accordance with Section 1.6(a)(2), on November 8, 2017 (before the closing of the merger), Wood and Velocloud entered into an Option Consent and Substituted Option Agreement (the "Substituted Option Agreement").[25]

Consistent with the Merger Agreement, the Substituted Option Agreement distinguished between the treatment of vested and unvested portions of Velocloud options in the merger.  Portions of any in-the-money option that had vested would be converted into the right to receive cash, based on a specified formula.[26]  The treatment of any portion of an unvested Velocloud option would depend on the option holder's status after the closing of the merger.  If the option holder continued on as an employee or service provider of VMware or its subsidiaries (including Velocloud), VMware would "substitute an option to purchase shares of [VMware] Common Stock (a 'Substitute Option')."[27]  The Substituted Option Agreement provided that "[e]ach Substitute Option will contain the same material terms and conditions as were applicable to such [Velocloud] Option as of immediately prior to

---

[24] *Id.* § 1.6(a)(2) ("Parent shall . . . substitute the portion of any Company Option that was unvested immediately prior to the Effective Time, has been issued to a Continuing Employee and is exercisable for an exercise price less than the Per Share Consideration . . . with an option to acquire, on the same material terms and conditions as were applicable to such Rollover Option as of immediately prior to such substitution by Parent.").

[25] Ex. C at Ex. 2 ("Substituted Option Agreement").

[26] *Id.* at 2–3.

[27] *Id.* at 3–4.

such substitution" subject to certain exceptions not implicated here.[28] Under the Substituted Option Agreement, Wood received a new option to purchase 2,110 shares of VMware common stock in exchange for relinquishing his rights to the 21,670 remaining unvested Velocloud shares underlying the 2015 Option Agreement. The VMware shares underlying the substituted option vest on the same schedule as contained in Wood's 2015 Option Agreement.[29] Wood has not attempted to exercise his option in VMware, and there is no dispute between the parties about the treatment of this portion of Wood's Velocloud securities.

## 2. Vested Common Stock

Under Section 1.4 of the Merger Agreement, nearly all vested shares of Velocloud common stock[30] would be canceled and would be converted into the right to receive $11.73952 per share.[31] On December 11, 2017, Wood executed a Letter of Transmittal providing for the surrender of his vested shares of Velocloud stock

---

[28] *Id.* at 4.

[29] *Id.*

[30] There are certain exceptions as to stock held by VMware and its affiliates, which are not pertinent here.

[31] Merger Agreement § 1.4(c) ("Each share of Company Capital Stock (other than the Canceled Shares, shares of Company Restricted Stock and Dissenting Shares) issued and outstanding immediately prior to the Effective Time will be converted into the right to receive . . . an amount of cash (without interest) equal to the Per Share Consideration."). "Company Restricted Stock" is defined as unvested Velocloud common stock. *Id*. § 1.8 at 90.

8

and payment for those shares in the merger.[32]  In the Letter of Transmittal, Wood agreed that he "shall be bound by the provisions of the Merger Agreement."[33] Following consummation of the merger, Wood received $1,743,799.59 in cash in exchange for his 148,541 vested shares in Velocloud.[34]  There is no dispute between the parties about the treatment of this portion of Wood's Velocloud securities.

### 3.    Unvested Common Stock

Section 1.6(b) of the Merger Agreement addresses the treatment of unvested shares of Velocloud common stock.   The pertinent subsection for continuing employees, like Wood, is Section 1.6(b)(1).  It provides:

> [E]ach holder of Company Restricted Stock that is a Continuing Employee (each a "Continuing Restricted Stock Holder") will enter into an installment agreement in the form attached hereto as exhibit G (the "Restricted Stock Installment Agreement"), pursuant to which, contingent upon the consummation of the Merger, each share of Company Restricted Stock issued and outstanding immediately prior to the Effective Time held by such Continuing Restricted Stock Holder will automatically be canceled and will cease to exist, and such Continuing Restricted Stock Holder will cease to have any rights with respect thereto, except the right to receive, on the condition that such holder enters into the Restricted Stock Installment Agreement, an amount (without interest) per share of Company Restricted Stock equal to the Per Share [Merger] Consideration, such amount to be payable in accordance with the terms and conditions of such holder's Restricted Stock Installment Agreement.[35]

---

[32] Compl. ¶ 36; Answer ¶ 36; Dkt. 25 at Ex. 8.

[33] Dkt. 25 at Ex. 8.

[34] Compl. ¶ 43; Answer ¶ 43.

[35] Merger Agreement § 1.6(b)(1).

9

Pursuant to Section 1.6(b)(1), Wood entered into a Restricted Stock Installment Agreement (the "RSI") with VMware on December 12, 2017.[36] Wood's RSI provided for 17 monthly payments of $41,287.88, beginning on January 1, 2018 and ending on May 1, 2019, which tracked the vesting schedule in the original Option Agreement.[37]

Section 1(b) of the RSI, titled "Termination" provides:

Parent's obligation to make future installment payments under this Section 1 will automatically terminate on the date on which Holder's Continuous Service terminates (the "Service Termination Date"), and Holder will automatically forfeit any unpaid portion (other than amounts that are earned and past due) of the Restricted Stock Installment Consideration (such unpaid portion other than amounts past due, the "Forfeited Amount"), except that Parent will pay to Holder promptly after such Service Termination Date an amount equal to the (i) (A) the Forfeited Amount divided by (B) the Per Share Consideration, multiplied by (ii) the purchase price per share that Holder paid for the shares of the Company Restricted Stock that correspond to the Forfeited Amount.[38]

Beginning in January 2018, Wood began to receive monthly cash payments of $41,287.88 pursuant to the RSI.[39] On August 13, 2018, Wood voluntarily resigned from VMware.[40] Thereafter, VMware stopped sending monthly payments

---

[36] Ex. B ("RSI").

[37] *Id.* at Ex. A.

[38] RSI § 1(b).

[39] Compl. ¶ 45; Answer ¶ 45.

[40] Compl. ¶ 46; Answer ¶ 46.

to Wood. In December 2018, VMware sent Wood $15,193.44, which it contends is the amount owed to him under the formula in Section 1(b)(i) and (ii) of the RSI.[41]

## C.    California Action

On December 13, 2021, Wood filed an action against VMware in the Superior Court of the State of California, County of Santa Clara (the "California Action").[42] The California Action asserted a variety of claims against VMware, including for breach of contract and specific performance. Wood alleged that VMware owed him 3,086 shares of VMware Class A common stock because it failed to exercise its Repurchase Option under the RSPA following the termination of Wood's employment.[43] VMware moved to stay or dismiss the California Action, arguing that Wood was required to litigate his claims in Delaware under the exclusive forum provisions in the Merger Agreement and RSI.[44] The California court concluded that that "any claim that [Wood] may have as to unvested shares in Velocloud common stock can only be brought under the Merger Agreement and Restricted Stock

---

[41] Compl. ¶ 46; Answer ¶ 46.

[42] Compl. ¶ 47; Answer ¶ 47; Ex. C.

[43] Ex. C ¶¶ 15–16, 21.

[44] Ex. D at 2.

11

Installment Agreement."[45] The court stayed the California Action until this action is concluded.[46]

### D. Procedural History

On September 16, 2022, VMware filed its verified complaint in this action.[47] VMware seeks an order declaring that Wood is not entitled to recover any further consideration for his unvested shares of Velocloud common stock. On October 24, 2022, Wood answered the complaint and asserted seven counterclaims against VMware.[48] Wood's counterclaims include claims for breach of contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel, specific performance, violations of the California labor code, unfair competition, and conversion. Wood argues that, based on his calculations, he is entitled to 3,086 shares of VMware common stock due to VMware's failure to exercise its Repurchase Option in the RSPA, which Wood argues is incorporated into the RSI. Each of Wood's counterclaims turns on the question of whether Wood is entitled to VMware stock.

---

[45] *Id.*

[46] *Id.* at 3.

[47] Dkt. 1.

[48] Dkt. 13.

Wood has moved for partial summary judgment on his breach of contract and specific performance claims.[49] VMware has moved to dismiss Wood's counterclaims and seeks summary judgment on its declaratory judgment claim.[50] The court heard argument on February 16, 2023, and received additional materials from the parties on February 17.

## II. ANALYSIS

### A. The Standards of Review

Under Court of Chancery Rule 12(b)(6), a complaint may be dismissed for failure to state a claim if the claimant "could not recover under any reasonably conceivable set of circumstances susceptible of proof." *Central Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011). Under Court of Chancery Rule 56, summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Ct. Ch. R. 56.

All three pending motions concern the same question: Is Wood entitled to 3,086 shares of VMware common stock? Thus, the court is called upon to construe the parties' contracts.

---

[49] Dkt. 14.

[50] Dkts. 18, 23–25.

The correct construction of a contract is a question of law. *Exelon Generation Acqs., LLC v. Deere & Co.*, 176 A.3d 1262, 1266–67 (Del. 2017). "Delaware law adheres to the objective theory of contracts, *i.e.*, a contract's construction should be that which would be understood by an objective, reasonable third party." *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010). The court will construe the contract as a whole and attempt to give effect to all of its provisions. *Sunline Com. Carriers, Inc. v. CITGO Petrol. Corp.*, 206 A.3d 836, 836 (Del. 2019). "Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997). Where, as here, the case turns on the interpretation of a contract, dismissal or summary judgment is appropriate only if the contract in question is unambiguous. *Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996); *GMG Cap. Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 783 (Del. 2012). "A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction. Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).

14

**B.    Wood's Theory Ignores the Unambiguous Language of the Agreements.**

Wood's legal theory is cobbled together from provisions in several different agreements spanning several years. To begin the analysis, it is helpful to recap what Wood held before the merger and what he received in the transaction.

Immediately prior to the merger, Wood held three types of securities in Velocloud: vested common stock, unvested common stock, and a stock option. In the merger, Wood's vested common stock was cashed out for approximately $1.7 million, and his unexercised option to purchase 21,670 shares of Velocloud common stock was replaced with an option to purchase 2,110 shares of VMware common stock.[51] There is no dispute about that. The subject of Wood's claim is the 59,789 shares of Velocloud common stock that Wood purchased in October 2015 which had not yet vested as of the effective date of the merger. Wood makes several inconsistent arguments as to how those unvested shares were or should have been treated in the merger.

Wood's theory goes as follows: First, he claims that those 59,789 unvested shares of Velocloud restricted stock were converted into an option to purchase unvested VMware shares pursuant to the Substituted Option Agreement, using the

---

[51] There is no allegation that this option has been exercised.

15

exchange ratio therein.[52] Second, Wood asserts that the stream of monthly payments under the RSI "represented the ongoing monthly vesting and payout of Mr. Wood's previously unvested VMware options that had been substituted for Mr. Wood's unvested early-exercised VeloCloud options."[53] Third, after receiving eight monthly payments under the RSI, Wood resigned from VMware, forgoing the remaining 9 months of installment payments. Wood then takes the total amount of that forgone payment stream and converts it into an equivalent number of VMware options, based on the conversion ratio in the Substituted Option Agreement.[54] Wood calculates this to be 3,086 VMware shares.[55]

Next, Wood contends that the 3,086 shares were subject to Velocloud's Repurchase Option contained in the RSPA. If Velocloud did not exercise its right to repurchase the Wood's unvested shares within 90 days from the date that his employment terminated, Velocloud would be obliged to deliver to Wood a share

---

[52] Def.'s Opening Br. 6, 8.

[53] *Id*. at 8.

[54] Counterclaim Compl. ¶ 28.

[55] Wood applies the exchange ratio to his 59,789 unvested shares of Velocloud stock and concludes that he was owed 5,822 shares of VMware common stock. He then reduces that figure by accounting for the eight months of RSI payments that he received, which adjusts the number of shares he demands to 3,086. *See* Counterclaim Compl. ¶ 28; Def.'s Opening Br. 9.

certificate for each of Wood's unvested shares.[56] Wood argues that, but virtue of the merger, VMware assumed that obligation through the Substituted Option Agreement. Thus, Wood claims entitlement to "3,086 unrestricted VMware shares."[57]

Wood's theory is flawed in several respects. First and fundamentally, it conflates options with stock. Throughout his Counterclaim Complaint and briefs, Wood refers to the 59,789 unvested shares of Velocloud stock that he owned immediately before the closing of the merger as early exercised unvested options.[58] In doing so, he seeks to have his unvested stock treated the same as his unvested options under the Substituted Option Agreement, while still possessing the right to a repurchase or delivery of shares under the RSPA and Escrow Instructions. The court cannot accept Wood's tortured reading of the agreements and ignore their plain and unambiguous terms. *See AT&T Corp. v. Lillis*, 953 A.2d 241, 252 (Del. 2008) ("Courts will not torture contractual terms to impart ambiguity where ordinary meaning leaves no room for uncertainty.").

---

[56] *Id.* The Repurchase Option is contained in the RSPA. RSPA § 1. The obligation to deliver shares in the event the Repurchase Option is not timely exercised is contained in the Escrow Instructions. Escrow Instructions § 4.

[57] Counterclaim Compl. ¶ 32.

[58] *See*, *e.g.*, Def.'s Opp'n Br. 10; Counterclaim Compl. ¶ 28.

17

The Substituted Option Agreement provided for the substitution of VMware options for Velocloud options. It states: "Each Substitute Option will contain the same material terms and conditions as were applicable to such [Velocloud] Option as of immediately prior to such substitution."[59] The Substituted Option Agreement covers Wood's unexercised options, not his unvested stock. A stock option is "[a]n option to buy or sell a specific quantity of stock at a designated price for a specified period regardless of shifts in market value during the period." *Stock Option*, Black's Law Dictionary (11th ed. 2019). "Options are not shares." *Fox v. CDX Hldgs., Inc.*, 2015 WL 4571398, at *35 (Del. Ch. July 28, 2015), *aff'd*, 141 A.3d 1037 (Del. 2016). Once Wood exercised his option to purchase 208,330 shares of unvested Velocloud common stock in October 2015, no option remained outstanding as to those shares. The Plan confirms this. "Exercising an Option in any manner will decrease the number of shares thereafter available . . . for sale under the Option, by the number of Shares as to which the Option is exercised."[60] Wood's 59,789 unvested shares of Velocloud stock were no longer eligible for purchase under the Option Agreement because he had already exercised and purchased the shares in 2015. Wood was not entitled to a substitute option for those shares because the scope of the Substituted Option Agreement is confined to "the treatment of

---

[59] Substituted Option Agreement at 4.

[60] Plan § 6(f)(i).

18

outstanding *options* to purchase shares of the Company's common stock."[61] The Substituted Option Agreement did not affect the treatment of Wood's 59,789 unvested shares of Velocloud common stock.[62]

VMware was also not required to either repurchase or deliver Wood's unvested shares under the Repurchase Option and Escrow Instructions. Wood's unvested Velocloud stock was canceled in the merger in exchange for a payment stream under the RSI. The RSI provides that "[f]or each share of Company Restricted [*i.e.*, unvested] Stock held by Holder [*i.e.*, Wood], Holder will become eligible to receive an amount (without interest) equal to the Per Share Consideration."[63] Under the terms of the agreement, Wood agreed to surrender his unvested Velocloud stock in exchange for a stream of cash to be paid in monthly installments. In Wood's case, those monthly installments were $41,287.88 from January 1, 2018 through May 1, 2019.[64] The agreement states that VMware's "obligation to make future installment payments . . . will automatically terminate on the date on which Holder's Continuous Service terminates (the 'Service Termination

---

[61] Substituted Option Agreement at 1 (emphasis added); *see also id.* at 5 ("I agree to the treatment of my Company Options as described in this consent and agreement.").

[62] As noted earlier, Wood's outstanding option to purchase 21,670 Velocloud shares was eligible for substitute options under the Substituted Option Agreement. Under that agreement, Wood received a substituted option to purchase 2,110 shares of VMware stock. There is no claim in this case about that option.

[63] RSI at 1.

[64] *Id.* at Ex. A.

19

Date'), and Holder will automatically forfeit any unpaid portion . . . of the Restricted Stock Installment Consideration."[65]  The RSI's unambiguous terms provide that Wood's unvested Velocloud shares would be canceled in exchange for a right to receive regular cash payments that would be terminated if Wood stopped working for VMware before all payments were made.  Section 1.6(b)(1) of the Merger Agreement, to which Wood expressly agreed to be bound,[66] confirms this result:

> [E]ach share of Company Restricted [*i.e.*, unvested Velocloud] Stock issued and outstanding immediately prior to the Effective Time held by such Continuing Restricted Stock Holder will automatically be canceled and will cease to exist, and such Continuing Restricted Stock Holder will cease to have any rights with respect thereto, except the right to receive, on the condition that such holder enters into the Restricted Stock Installment Agreement, an amount (without interest) per share of Company Restricted Stock equal to the Per Share Consideration, such amount to be payable in accordance with the terms and conditions of such holder's Restricted Stock Installment Agreement.[67]

Wood argues, however, that the RSI does not eliminate VMware's obligation to either repurchase or deliver his unvested shares under the Repurchase Option and Escrow Instructions.  Rather, Wood contends that these obligations were preserved under the integration clause in the RSI.  This argument fails.

---

[65] RSI § 1(b).

[66] Dkt. 25 at Ex. 8 § 5.

[67] Merger Agreement § 1.6(b)(1).

20

The RSI's integration clause states that it, "together with the Merger Agreement and the other Transaction Agreements, constitutes the entire agreement of the parties with respect to the subject matter of this agreement and supersedes all prior and contemporaneous agreements . . . between the parties."[68] The 2015 RSPA and Escrow Instructions are not among the documents within the defined term "Transaction Agreements." Although the Substituted Option Agreement is among the Transaction Documents,[69] it pertains only to "the treatment of outstanding options to purchase shares," not previously purchased stock.[70] Even if there were any conflict between the RSPA and the RSI, the RSI would control. "Delaware recognizes that where a new, later contract between the parties covers the same subject matter as an earlier contract, the new contract supersedes and controls that issue, if the two agreements conflict." *Cabela's LLC v. Wellman*, 2018 WL 5309954, at *4 (Del. Ch. Oct. 26, 2018) (citing *Country Life Homes, Inc. v. Shaffer*, 2007 WL 333075, at *5 (Del. Ch. Jan. 31, 2007)). Thus, the RSI and the enumerated Transaction Agreements control the treatment of Wood's unvested Velocloud stock in the merger, not the RSPA and Escrow Instructions.

---

[68] RSI § 5(e).

[69] *See* Merger Agreement, Ex. A-2 ("Joinder Agreement"); Counterclaim Compl. ¶ 22.

[70] Substituted Option Agreement at 1.

Wood argues that VMware could not "cancel a right to equity that Mr. Wood obtained when he received his stock option grant on June 30, 2015."[71]  But Wood offers no legal support for this argument and ignores that he voluntarily executed the RSI on December 12, 2017.  That agreement, which incorporates the Merger Agreement, provided for the cancelation of Wood's unvested Velocloud shares in exchange for a stream of cash payments.

Finally, Wood argues that if the terms under the RSI are substituted for Wood's rights under the Option Agreement and RSPA, then the RSI is not supported by any consideration.[72]  This argument lacks merit.  In order for a contract to be valid, the parties must exchange legal consideration. *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010).  "Consideration for a contract can consist of either a benefit to the promiser or a detriment to the promisee." *First Mortg. Co. of Pa. v. Fed. Leasing Corp.*, 456 A.2d 794, 795–96 (Del. 1982) (citations omitted).  "[I]f the promisee parts with something at the promisor's request, it is immaterial whether the promisor receives anything." *Id.* at 796 (citing 1 Williston on Contracts § 113 (3d ed. 1979)).

> Consideration requires that each party to a contract convey a benefit or incur a legal detriment, such that the exchange is "bargained for."  If this requirement is met, there is no additional requirement of

[71] Def.'s Opp'n Br. 4.

[72] *Id.* at 7.

22

equivalence in the values exchanged because we limit our inquiry into consideration to its existence and not whether it is fair or adequate.

*Cox Commc'ns, Inc. v. T-Mobile US, Inc.*, 273 A.3d 752, 764 (Del. 2022) (internal citations omitted).

Wood agreed to the cancellation of his unvested Velocloud shares in exchange for a stream of cash payments governed by the terms of the RSI. This bargained-for exchange serves as legal consideration for the RSI.

Wood's reliance on *Cigna Health & Life Ins. Co. v. Audax Health Sols., Inc.*, 107 A.3d 1082, 1091 (Del. Ch. 2014), is misplaced. In *Cigna Health*, a stockholder refused to agree to a release as a condition to the payment of merger consideration. The release did not appear in the merger agreement and, instead, was contained in a letter of transmittal delivered to stockholders after the closing of a merger. The court held the release was unenforceable due to a lack of consideration. *Id.* The court reasoned that "the Release Obligation [wa]s a new obligation Defendants seek to impose on Cigna post-closing, and . . . nothing new [was] provided to Cigna beyond the merger consideration to which it became entitled when the Merger was consummated and its shares were canceled." *Id.*

*Cigna Health* is inapposite. Wood's entry into the RSI was a condition to VMware's consummation of the merger,[73] and Wood entered into the RSI before the

---

[73] RSI at 1.

23

merger was consummated. Wood freely exchanged any right he had to the unvested, restricted, and illiquid Velocloud shares for the new right to the payment stream in the RSI. In doing so, he also avoided transaction costs associated with any future sale of that stock. *See Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 2000 WL 1476663, at *15 (Del. Ch. Sept. 27, 2000) (recognizing that an offer may benefit unitholders with small blocks of equity when it offers them liquidity without the obligation to pay brokerage fees); *Applebaum v. Avaya, Inc.*, 805 A.2d 209, 216 (Del. Ch. 2002) (noting that the fact that "[t]he cash payment made for shares will not be reduced to reflect transaction costs which, in a regular sale, would amount to a significant portion of the total proceeds of sale" supports an argument of fair price).

Wood's argument against the enforceability of the RSI also fails because he accepted eight months of cash payments under its terms. Having accepted the benefits of the RSI, he cannot now claim it is unenforceable due to a lack of consideration. *See In re Mobilactive Media, LLC*, 2013 WL 297950, at *14 (Del. Ch. Jan. 25, 2013) ("By continuing to accept the benefits of the contract, however, Silverback essentially admitted to its validity, and is estopped from arguing voidability."); *DeMarie v. Neff*, 2005 WL 89403, at *5 (Del. Ch. Jan. 15, 2005) ("[T]he nonbreaching party may not, on the one hand, preserve or accept the benefits of a contract, while on the other hand, assert that contract is void and unenforceable."). The RSI is supported by consideration and is enforceable.

24

Under the plain language of the RSI and Merger Agreement, Wood is not entitled to 3,086 shares of VMware common stock. In entering into the RSI and binding himself to the Merger Agreement, Wood accepted that his unvested Velocloud stock would be canceled and that he would be entitled to a monthly cash payment that would be terminated if Wood ceased his employment with VMware. As such, Plaintiff's motion for summary judgment on its claim for declaratory judgment is granted, and Defendant's motion for partial summary judgment as to his breach of contract and specific performance claims is denied.

## C. Motion to Dismiss

Wood has asserted counterclaims for breach of contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel, specific performance, violations of the California labor code, unfair competition, and conversion. VMware has moved to dismiss each of Wood's seven counterclaims for failure to state a claim.

Count I, the breach of contract claim, alleges that VMware breached the RSPA and Substituted Option Agreement by failing to deliver to Wood 3,086 shares of VMware common stock. Count II alleges that VMware's failure to deliver the stock "was wrongful, in bad faith, arbitrary and unfair, and therefore breached the covenant of good faith and fair dealing."[74] Count III alleges in the alternative that if

---

[74] Counterclaim Compl. ¶ 43.

the contractual agreement "regarding the equity grant is found to be invalid, VMware is nevertheless liable under the doctrine of promissory estoppel."[75]  Count IV seeks specific performance requiring VMware to deliver 3,086 shares of VMware common stock to Wood.  Count V alleges that VMware violated the California labor code because the VMware stock to which Wood claims entitlement constituted wages.  Count VI contends that VMware's actions and conduct constitute unlawful, unfair, and fraudulent business practices because VMware has been deprived Wood of property and benefits (*i.e.*, VMware stock) that Wood believes he was owed.  Count VII is a claim for conversion of the VMware stock to which Wood claims entitlement.

Each of Wood's counterclaims rises or falls on the question of Wood's entitlement to VMware stock.  Wood does not argue otherwise.  As discussed above, under the unambiguous language of the contracts at issue in this case, Wood is not entitled to receive any shares of common stock in VMware.  Therefore, each of his seven counterclaims must be dismissed.

## III.  CONCLUSION

Plaintiff's motion for summary judgment is granted, and Defendant's motion for partial summary judgment is denied.  Plaintiff's motion to dismiss Wood's counterclaims is granted in its entirety.

---

[75] *Id.* ¶ 48.